*97 Chief Judge CRAWFORD
delivered the opinion of the Court.
INDEX
FACTS 97
DISCUSSION 98
I. Denial of a Challenge for Cause 98
II. Consideration of the Legality of an Order as a Question of Law 100
III. Legality of the Order 106
IV. Application of the Political Question Doctrine 108
Contrary to his pleas, appellant was convicted by a special court-martial consisting of officer and enlisted members of failure to obey an order to wear his U.S. Army uniform modified with United Nations (UN) accoutrements, in violation of Article 92(2), Uniform Code of Military Justice, 10 USC § 892(2). Appellant’s sentence to a bad-conduct discharge was approved by the convening authority. The Court of Criminal Appeals affirmed the findings and sentence. 50 MJ 729 (1999). We granted review of the following issues:
I. WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT’S CAUSAL CHALLENGE AGAINST A COURT-MARTIAL MEMBER WHO PREVIOUSLY ORDERED A SUBORDINATE TO DEPLOY TO MACEDONIA.
II. WHETHER APPELLANT’S CONSTITUTIONAL AND STATUTORY RIGHTS TO BE TRIED BY COURT-MARTIAL MEMBERS AND TO HAVE THE MEMBERS DETERMINE WHETHER THE GOVERNMENT HAS PROVED EVERY ESSENTIAL ELEMENT OF THE CHARGED OFFENSE BEYOND A REASONABLE DOUBT WERE VIOLATED BECAUSE THE MILITARY JUDGE RULED THAT THE ORDER GIVEN TO APPELLANT WAS LAWFUL WITHOUT SUBMITTING THE ISSUE TO THE MEMBERS, AND BECAUSE THE MILITARY JUDGE INSTRUCTED THE MEMBERS THAT THE ORDER WAS LAWFUL AS A MATTER OF LAW.
III. WHETHER THE MILITARY JUDGE ERRED BY FINDING THAT THE ORDER TO DEPLOY IN THE UNITED NATIONS UNIFORM WAS LAWFUL.
IV. WHETHER THE MILITARY JUDGE ERRED BY AVOIDING THE QUESTION OF THE LAWFULNESS OF THE ORDER AND HOLDING THAT LAWFULNESS WAS A NON-JUSTICIABLE POLITICAL QUESTION.
For the reasons set forth below, we affirm the decision of the Court of Criminal Appeals.
FACTS
In 1992, the UN established a Protective Force (UNPROFOR) in the Former Yugoslavian Republic of Macedonia (FYROM). The United States contributed troops to this force in 1993 and, in 1995, this force was redesignated as the UN Preventive Deployment Force (UNPREDEP).
In August of 1995, 1st Battalion, 15th Infantry Regiment, 3d Infantry Division (1/15 Infantry) was ordered to assume the FYR-OM UNPREDEP mission as of November 1, 1995. Appellant, a medic, was attached to a squad of Company A, % Infantry. Appellant *98 expressed concern about wearing the UN accoutrements on his U.S. uniform. 50 MJ at 733-34. Specifically, uniform modifications included in part the UN blue beret and field cap, a UN blue shoulder patch, blue scarf, and UN badge and identification card to be issued in the FYROM. Id. at 734 n. 7. On August 23,1995, appellant was ordered to do research on the history and objectives of the UN and submitted a written statement of his position at the suggestion of his command. He stated that he could not assess the legality of the order to wear the modified uniform because he did not “understand the legal basis” of the order.
Appellant’s concerns were discussed by his father on the Internet and were reported in the popular media and noted by several members of Congress. Appellant’s noncom-missioned officer leadership, company commander, and battalion commander each spoke with him to alleviate his doubts about the legality of the UNPREDEP mission and the uniform modification. Appellant did not inform anyone in his chain of command that he believed that the UN accoutrements conflicted with Army Regulation (AR) 670-1, Wear and Appearance of Army Uniforms and Insignia (1 September 1992).
Prior to deployment, the unit was granted leave and appellant visited Washington, D.C. In Washington, he met with his future counsel and with several legislators who were concerned about the legality of the UNPRE-DEP mission and about President Clinton’s representations to Congress.
On October 2, 1995, the unit was briefed by the battalion commander on the legality of the FYROM UNPREDEP mission, but not on specific battle dress uniform (BDU) modifications. The unit was ordered to wear the modified uniform starting on October 10. 50 MJ at 734. Appellant’s company commander, Captain (CPT) Palmateer, reissued these orders at a company formation. Appellant turned in the required two sets of BDUs to be altered.
At the next formation, appellant reported in unaltered BDUs and was removed from the formation. Two hours later, he was given a “second chance” to comply with the order by Lieutenant Colonel (LTC) Layfield and refused. Appellant was then declared non-deployable. 50 MJ at 735. The order and his responses formed the basis for the charge of disobedience that is the subject of the present appeal.
DISCUSSION
ISSUE I — DENIAL OF A CHALLENGE FOR CAUSE
During individual voir dire, a court-member, Colonel (COL) Dana F. Kwist, was asked whether he had “sent people to operations where they had to wear the blue beret.” He responded as follows to questions by one of his civilian defense counsel (CDC2):
COL KWIST: I have a captain in Macedonia that’s the headquarters commandant down there. I’m not certain if they’re wearing it in Northern Iraq, but I have a captain that’s attached down there, as well. CDC2: Okay. And did you — what, if any, opinion do you have about wearing that blue beret, as you sent two soldiers to do? COL KWIST: Well, I don’t know that I’ve ever formed an opinion. I don’t really think about it.
CDC2: Do you think about it?
COL KWIST: No, I don’t.
CDC2: Well, I mean, do you — you obviously sent two of your subordinates to do that, and the gist of this order — you’ve read the flyer there — is that somebody disobeyed that. Doesn’t that put them at odds, basically, with a decision that you’ve already made concerning the very same matter?
COL KWIST: I just don’t think about it like that. This comes down as a tasking from our corps headquarters, and I fill squares based on the taskings. No, I don’t get into that conversation or — at all.
Following voir dire, the defense challenged COL Kwist for cause partly “because he has a captain ... in Macedonia on the very mission that this pertains to.”[1] In response, trial counsel argued:
*99 And, as to his soldiers, he’s merely doing what he’s required to do, and that is receiving an order, executing it, and transmitting it. There is no indication that any of those soldiers raised the issues that the accused raised to him. He wasn’t confronted with this issue in sending his soldiers on these deployments. Soldiers obey orders. That’s the general rule. And every one of these members of the panel obeys orders, and if they obey an order, that’s not a basis for them now to be challenged just because what’s at issue in this case is disobeying an order.
The military judge denied this causal challenge, stating that he adopted trial counsel’s argument.
Appellant asserts that COL Kwist demonstrated actual and implied bias because he had a personal and professional interest in the result of appellant’s trial inasmuch as the challenged member gave precisely the same order as appellant was accused of disobeying. The Government argues that the defense failed to demonstrate any actual bias by COL Kwist and that appellant waived any claim of implied bias by failing to challenge COL Kwist on that basis at trial.
As we noted in United States v. Ai, 49 MJ 1, 4 (1998), a servicemember has a “right to impartial court-members to decide his guilt.” We have also noted that RCM 912(f)(l)(N), Manual for Courts-Martial, United States (1995 ed.), “codifies a general ground for challenge” which includes both actual and implied bias. United States v. Minyard, 46 MJ 229, 231 (1997).[2] The Rule’s discussion notes examples of grounds for challenge as including, “a direct personal interest in the result of the trial.” Further, RCM 912(f)(3) provides: “The burden of establishing that grounds for a challenge exist is upon the party making the challenge.”
First, we turn to the question whether appellant established actual bias. “The test for actual bias [in each case] is whether any bias is such that it will not yield to the evidence presented and the judge’s instructions.” United States v. Warden, 51 MJ 78, 81 (1999)(internal quotation marks omitted).
COL Kwist’s testimony during individual voir dire gave no indication that he would be unable to “yield to the evidence presented and the judge’s instructions.” When asked whether someone who refused to wear the blue beret would be at odds with him because he had ordered two of his soldiers to deploy to areas potentially requiring them to wear blue berets, he responded: “I just don’t think about it like that. This comes down as a tasking from our corps headquarters, and I fill squares based on the taskings. No, I don’t get into that conversation or — at all.” Moreover, COL Kwist indicated during group voir dire conducted by the military judge that he would base his decision on the evidence presented and the judge’s instructions.
“Actual bias is a question of fact” which “is reviewed subjectively, through the eyes of the military judge of the court members.” Warden, 51 MJ at 81 (internal quotation marks omitted). The evaluation of the potential member’s mental state is most important:
Where ... the totality of the circumstances indicate ... that a member is genuinely open to considering all mitigating and extenuating factors which are relevant to a just sentence before arriving at a fixed conclusion, a military judge has broad discretion to grant or deny challenges.
United States v. Rockwood, 52 MJ 98, 106 (1999)(emphasis in original). Applying this standard, we hold that the military judge did not err in denying the challenge for cause on the basis of actual bias.
Next, we turn to the question of whether appellant established implied bias. “[I]mplied bias is viewed through the eyes of *100 the public,” and “[t]he focus is on the perception or appearance of fairness of the military justice system.” Warden, 51 MJ at 81 (internal quotation marks omitted).
Appellant argues that COL Kwist would be biased in that he would “lose face” unless appellant were convicted because the legitimacy of his own order would be questioned. COL Kwist’s testimony reveals a position quite contrary to appellant’s assertion. He indicated that because of the lack of controversy, he did not view the matter personally but rather as merely “fill[ing] squares based on the taskings” from “corps headquarters.” As a practical matter, all officers who sit on courts-martial have given or received orders of all kinds as a standard part of military life. It is unlikely that the public would view all officers or all enlisted personnel who have ever given an order as being disqualified from cases involving disobedience of orders that are similar to any they may have given in the past. Such a standard would make it virtually impossible to find members to sit on cases involving disobedience of orders.
Although “[w]e give the military judge less deference on questions of implied bias,” we hold that there was no error under these facts. Warden, 51 MJ at 81, citing United States v. Youngblood, 47 MJ 338, 341 (1997).
ISSUE II — CONSIDERATION OF THE LEGALITY OF AN ORDER AS A QUESTION OF LAW
This case involves some of the most difficult choices that may confront our Government and our men and women in uniform. Faced with increasing instability in the Balkans, the United States had to decide whether to deploy U.S. troops in support of the peacekeeping effort in the former Yugoslavian Republic of Macedonia, how to structure command and control relationships with other national and international forces in the area, what types of orders were needed to implement those relationships, and how to dispose of alleged violations of such orders. Appellant had to decide whether he should voice his opposition to those decisions, how to do so, and whether to obey orders that he viewed as unlawful.
Appellant chose to manifest his opposition through disobedience of an order from his commander, and he challenged the legality of that order at his court-martial. He now asks this Court to create an exception to the requirement that the military judge decides questions of law where, as in this case, appellant claims the question of law is an element of the alleged offense. So framed, the issue requires us to make a choice and decide whether lawfulness of the order was a legal question for the military judge or an element that should have been submitted to the members. There are respectable arguments on both sides of the question.
This Court reviews the question of whether the military judge correctly determined that the issue was a question of law on a de novo standard of review. For the reasons set forth below, we hold that lawfulness of an order, although an important issue, is not a discrete element of an offense under Article 92. We further hold that, in this case, the military judge properly decided the issue of lawfulness as a question of law. See Art. 51(b), UCMJ, 10 USC § 851(b).
Military personnel are obligated to obey lawful orders and regulations. Arts. 90, 91, and 92, UCMJ, 10 USC §§ 890, 891, and 892, respectively. The term “lawful” recognizes the right to challenge the validity of a regulation or order with respect to a superior source of law.
A “regulation” is an “authoritative rule or principle....” The term includes “a rule or order having the force of law issued by an executive authority of a government usu[ally] under power granted by a constitution or delegated by legislation____” Webster’s Third New International Dictionary 1913 (1981). An “order” means a “rule or regulation made by competent authority;” “an authoritative mandate usu[ally] from a superior to a subordinate;” and “a written or oral directive from a senior military or naval officer to a junior telling him what to do but giving him certain freedom of action in complying.” Id. at 1588 (emphasis added).
*101 The role of what is now the military judge (MJ) in ruling on questions of law was discussed during the 1949 House hearings that preceded enactment of the UCMJ. During the hearings, Congressman DeGraffenried asked whether a ruling by a law officer (now MJ) on a question of law would be binding on the court members. Mr. Larkin, a Department of Defense witness, see 33 MJ LXI, responded:
It is absolutely binding, except for the fact of course that any member of the court whether he is a lawyer or otherwise may for his own personal reason not follow them, which is a situation that obtains in any court in the land. The judge may rule on the questions of law and he may instruct the jury and charge them and as it happens the jury goes out and pays no attention to them whatever. But that is something over which no one has any control in any tribunal.
Mr. DeGraffenried. He acts as the judge on questions of law?
Mr. Larkin. That is right. He acts as an outright judge on questions of law and his rulings are final and binding. Whether any individual person decides that he doesn’t want to follow them or not of course is a different problem.
Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm, (hereafter Hearings), 81st Cong., 1st Sess. 1154 (1949).
As a result of these and other hearings, the Code was passed by Congress. By statute, “[t]he military judge ... shall rule upon all questions of law and all interlocutory questions arising during the proceedings.” Art. 51(b), UCMJ, 10 USC § 851(b). The Manual for Courts-Martial provides that the military judge shall, “[sjubject to subsection (e) of this rule [regarding finality of rulings], rule on all interlocutory questions and all questions of law raised during the court-martial.” RCM 801(a)(4).
In United States v. Carson, 15 USCMA 407, 408, 35 CMR 379, 380 (1965), our Court noted in dicta that the legality of an order in a disobedience case is an issue of law, as follows:
Whether an act comports with law, that is, whether it is legal or illegal, is a question of law, not an issue of fact for determination by the triers of fact. For example, in a prosecution for disobedience of an order, in violation of Article 92, Code, supra, 10 USC § 892, the court-martial must determine whether the order was given to the accused, but it may not consider whether the order was legal or illegal in relation to a constitutional or statutory right of the accused.
Paragraph 57b, Manual for Courts-Martial, United States, 1969 (Revised edition), expressly treated the legality of an order in a disobedience case as a question of law to be decided by the military judge. See U.S. Dep’t of the Army, Pam. No. 27-2, Analysis of Contents, Manual for Courts-Martial, United States, 1969, Revised Edition (1970), at 10-5 (citing Carson). The provisions of the 1969 Manual have been carried forward in this Discussion accompanying RCM 801(e)(5) in the current Manual:
Questions of law and interlocutory questions include all issues which arise during trial other than the findings (that is, guilty or not guilty), sentence, and administrative matters such as declaring recesses and adjournments. A question may be both interlocutory and a question of law____
Questions of the applicability of a rule of law to an undisputed set of facts are normally questions of law. Similarly, the legality of an act is normally a question of law. For example, the legality of an order when disobedience of an order is charged, the legality of restraint when there is a prosecution for breach of arrest, or the sufficiency of warnings before interrogation are normally questions of law. It is possible, however, for such questions to be decided solely upon some factual issue, in which case they would be questions of fact____
(Emphasis added.) See Art. 51(b)(the rulings of a military judge are final on “all questions of law,” as well as “all interlocutory questions,” except for “the factual issue of mental responsibility”). See RCM 801(a)(4); RCM 801(e)(1); RCM 801(e)(4) Discussion; cf. RCM 801(e)(2)(B)(in contrast to the rul *102 ings of the military judge, the rulings of the president of a special court-martial without a military judge are not final with respect to interlocutory questions of fact). See also RCM 801(e)(5) Discussion.
Judge Sullivan concludes that the issue of lawfulness in this case was an element that the military judge had to submit to the members. We have several significant points of disagreement with that conclusion and with several points raised by his separate opinion.
First, although he asserts that his approach represents a “modern military legal practice,” 55 MJ at 115, this Court has never held that “lawfulness” is an element that must be submitted to the members. At most, the cases cited in his separate opinion reflect isolated dicta or descriptions of circumstances in which predicate factual issues were submitted to the members. None of the cases cited by the separate opinion presented an issiie in which this Court was required to determine the relative responsibilities of the military judge and the members with respect to deciding lawfulness of an order. In fact, before the Supreme Court’s 1995 decision in Gaudin, we were not compelled to choose in a case such as this between treating lawfulness as an issue of law for the military judge or an element for the members. Prior to Gaudin, the Supreme Court had permitted trial judges to resolve certain legal issues without determining whether the Sixth Amendment required such issues to be submitted to a jury as an element. See, e.g., Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929). As we consider the issue whether lawfulness is an element of the offense of disobedience under Article 92, we note that the ambiguities in the Benchbook, lower court opinions, and dicta in our prior decisions reflect the pre-Gaudin era in which it was not necessary to resolve that issue. The case before us represents the first time, subsequent to Gaudin, that we must answer the question whether lawfulness is an element that must be submitted to the members.
Second, we do not agree that Unger v. Ziemniak, 27 MJ 349 (CMA 1989), controls the present case. As the separate opinion notes, Unger contains language suggesting that “[i]n a prosecution for disobedience, lawfulness of the command is an element of the offense.” Id. at 358. There are critical differences, however, between Unger and the present ease. The issue presented to our Court in Unger did not involve a dispute as to whether lawfulness is a discrete element, nor did the case require us to determine the appropriate division of responsibilities between the military judge and the members in a disobedience case.
Unger involved a pure question of law. Unger had submitted pretrial motions seeking dismissal of charges on the ground that the order for her to submit to a urinalysis examination was illegal as a matter of law. The military judge rejected the motions, and Unger sought appellate review through a request for extraordinary relief, which the court below denied. We in turn affirmed that decision. See 27 MJ at 350, 359. After concluding that the military judge correctly rejected the motions to dismiss the charges, the opinion in Unger ventured beyond the issue on appeal and suggested how the issue might be addressed “if’ there was a trial, indicating that lawfulness was an element to be decided by the members. The Unger opinion did not discuss Carson and provided only the most cursory rationale for the suggestion that lawfulness was an element to be decided by the members. Viewed in that context, the language in Unger does not carry the weight that we would accord a decision directly addressing a controversy briefed by the parties. That aspect of Unger has not been followed, and there is nothing in the opinion which persuades us that we should reject the longstanding approach of the Manual.
Third, we disagree with the separate opinion’s suggestion that lawfulness of an order must be treated as an element of a disobedience offense as a matter of constitutional law. 55 MJ 117. The Supreme Court has made clear that in a prosecution for violation of an order or regulation, the Constitution does not require that the validity of the order or regulation be decided by a jury. For example, in Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947), both the plural *103 ity (id. at 452-53, 68 S.Ct. 115) and the dissent (id. at 455, 68 S.Ct. 115) agreed that the validity of the regulation was an issue of law. (Douglas and Black, JJ., dissenting, but agreeing with the plurality that the issue of validity was a question “of law”). See generally Yakus v. United States, 321 U.S. 414, 433, 444-48, 64 S.Ct. 660 (1944)(Congress may require challenges to the validity of a regulation governing wartime price controls to be made in the context of a civil proceeding, thereby precluding a defendant from asking the judge, as well as the jury, to rule on the validity of the regulation in a criminal prosecution for violation of the regulation).
Fourth, we do not agree with the separate opinion’s reliance on Winthrop’s classic treatise, W. Military Law and Precedents (2d ed.1920 Reprint), for the proposition that lawfulness is an element that must be submitted to a “military jury.” 55 MJ at 117. Courts-martial in Winthrop’s day did not simply function as a civilian “jury”; they consisted solely of members — there was no equivalent of a military judge — and the members performed the duties of both judge and jury. See Winthrop, swpra at 54-55. It was not until 1951 that courts-martial included law officers who presided with the authority to rule finally on matters of law and did not also serve as members of the panel. See 1 F. Gilligan & F. Lederer, Court-Martial Procedure § 14-10.00 at 544-45 (2d ed.1999); United States v. Norfleet, 53 MJ 262, 266 (2000). Thus, until 1951, rulings on all legal issues in the Army, including rulings on motions, were made by the president of the court-martial or the law member (Article of War[3] (AW) 8 (1920)), subject to the objection of the other members (see AW 31 (1920)). The material from Winthrop quoted at length simply reflects Winthrop’s understanding that an accused had the opportunity to challenge the validity of regulations before a court-martial — -a body that acted as both judge and jury. The material in Winthrop does not demonstrate that the issue of validity was treated as an element with the Government bearing the burden of proof. Instead, Winthrop made clear that the court-martial should employ traditional legal analysis, applying the presumption of a regulation’s validity, to be overturned only if clearly contradicted by other established authority. Id. at 575-76.[4]
Our fifth point of disagreement involves the differences between a court-martial panel and a civilian jury. The Sixth Amendment right to trial by jury does not apply to courts-martial. Ex Parte Quirin, 317 U.S. 1, 39-45, 63 S.Ct. 2, 87 L.Ed. 3 (1942); see also United States v. Loving, 41 MJ 213, 285, 287 (1994), aff'd on other grounds, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996); United States v. Curtis, 32 MJ 252, 267 (CMA 1991), cert. denied, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991). Accused servicemembers are tried by a panel of their superiors, not by a jury of their peers. Court-martial members are not randomly selected, but instead are chosen by the commander who convenes the court-martial on a “best qualified” basis. See Art. 25(d)(2), UCMJ, 10 USC 825(d)(2); United States v. Tulloch, 47 MJ 283, 285 (1997).
Although the court-martial members perform many of the functions of a jury with respect to the determination of guilt or innocence, throughout most of our history, the *104 court-martial panel has served as both judge and jury. Even today, the UCMJ retains provisions for special court-martial members to serve as both judge and jury, with power to adjudicate a sentence of up to one year’s[5] confinement. If a military judge cannot be detailed “because of physical conditions or military exigencies,” the members of a special court-martial may act as both judge and jury in a case that results in a punitive discharge and up to 12 months’ confinement. Art. 19, UCMJ, 10 USC § 819 (as amended Oct. 5, 1999). These provisions and the historical functions of a court-martial panel underscore our conclusion that when Congress inserted the word “lawful” in the statutes governing disobedience, it was addressing the judicial role of the court-martial panel rather than creating an element for consideration by a factfinder.
Sixth, we do not agree that application of the principles in United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), requires that lawfulness of a regulation or order, in terms of its relationship to other provisions of law, be treated as an element of a disobedience offense. The underlying principle in Gaudin — that the judge must instruct the jury on the elements of the offense — is not a matter in controversy because it is well established by statute in the Uniform Code of Military Justice. See Art. 51(cj(setting forth the relationship between the military judge and the court-martial panel on elements and instructions). Thus, although the Supreme Court found it necessary to resort to constitutional principles in Gaudin, the allocation of responsibilities may be addressed as a matter of statutory interpretation in the military justice system.
The question in the present case is not whether the military judge must instruct the court-martial panel on the elements of an offense. That question is resolved by Article 51(c). Accordingly, treatment of the constitutional issues discussed in Gaudin does not control the present case. The question before us is a matter of statutory interpretation — whether, in this case, the issue of lawfulness was an element, and therefore should have been submitted to the members under Article 51(c); and if not an element, whether the military judge properly decided the issue of lawfulness as a question of law under Article 51(b). In that regard, it is noteworthy that Gaudin focused on the interpretation of a unique statute and did not purport to set forth general principles of interpretation applicable to all statutes. Moreover, in Gaudin, there was no dispute as to whether the word “material” constituted an element because the Government “conceded” that point. Id. at 511, 115 S.Ct. 2310. Both sides also agreed on the definition of “materiality,” i.e., that “[t]he statement must have a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.” 515 U.S. at 509, 115 S.Ct. 2310 (internal quotation marks' omitted).[6]
*105 The present case initially involves the question of whether it is necessary to consider lawfulness of an order as a separate and discrete element under Article 92. Inclusion of the word “lawful” in Article 92 did not add a separate element to the offense of violating a regulation or order. The word “lawful” reflects a question of law — the validity of the regulation or order with respect to a superior source of law — that is inherent in the terms “order” and “regulation” under Article 92.[7] The word “lawful” simply reinforces the opportunity for the accused to challenge the validity of the regulation or order with respect to a superior source of law without establishing a separate and distinct element of the offense. In light of the legislative history of the Code and the Manual, we conclude that “lawfulness” is a legal question for the judge. It is entirely different from many other matters which must be submitted to the court members such as “wrongfulness” or “materiality” if a servicemember is charged with a violation of 18 USC §§ 1001 under Article 134, UCMJ, 10 USC § 934. Adjudicating the issue of lawfulness as a question of law for the military judge ensures that the validity of the regulation or order will be resolved in a manner that provides for consistency of interpretation through appellate review. By contrast, if the issue of lawfulness were treated as an element that must be proved in each case beyond a reasonable doubt, the validity of regulations and orders of critical import to the national security would be subject to unreviewable and potentially inconsistent treatment by different court-martial panels.
Seventh, we note a significant internal contradiction in Judge Sullivan’s approach. The separate opinion asserts that “lawfulness of an order” is “an essential element of a disobedience offense,” 55 MJ at 115, and takes note of “the basic constitutional right of a criminal defendant ‘to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged.’” 55 MJ at 124 (citing Gaudin, supra at 522-23, 115 S.Ct. 2310) internal quotation marks omitted (emphasis added in the separate opinion). The separate opinion also notes that “a military accused has a codal and constitutional right to have members of his court-martial, not the military judge, determine whether the Government has proved, beyond a reasonable doubt, each and every element of the offense of which he is charged.” 55 MJ at 118 (footnote omitted). Elsewhere, however, the separate opinion endorses the proposition that the military judge may treat “lawfulness” in a disobedience case as a question of law and that the military judge properly did so in the present case, at least with respect to most of the issues raised by appellant. See 55 MJ at 115, 116. We cannot have it both ways. This case requires us to decide, with respect to regulations and orders under Article 92, whether “lawfulness” is a discrete element or whether it is a question of law. If “lawfulness” is indeed an “essential element,” the accused in a military trial has a statutory right for the issue to be resolved by the members under Article 51. If, however, “lawfulness” is a question of law, it may be resolved by the military judge. The cases cited in the separate opinion, 55 MJ at 116, support the role of the military judge in deciding issues of law, but do not authorize the military judge to withhold “essential elements” from the members. If we agreed that as a matter of statutory interpretation “lawfulness” established a discrete “essential element,” we would hold that the issue should have been submitted to the members. Because we conclude in this case that “lawfulness” is a question of law, the military judge did not err by resolving it himself without submission to the members.
Finally, we do not agree with Judge Sullivan’s assessment of the impact of any error. The separate opinion asserts that the issue of lawfulness of an order was “an essential element of this criminal offense,” 55 MJ at 122; *106 that it was an error of constitutional dimension for the military judge to decide this issue without submitting it to the members; and that the error was so egregious that it constituted a “radical departure from our political, legal, and military tradition.” 55 MJ at 115. The separate opinion nonetheless concludes that these considerations are of no moment because, in his view, the order was lawful, and any misstep by the military judge was harmless under Neder, 527 U.S. at 4, 119 S.Ct. 1827. 55 MJ at (37).
As noted above, if Judge Sullivan is correct in his assertion that lawfulness is an element that must be submitted to the members, we — as an appellate court — would have no more authority than the military judge to render a decision without requiring further proceedings to submit it to the members. Judge Sullivan’s analysis of the order, which embodies the characteristics of judicial reasoning on an issue of law, underscores our conclusion that the issue at trial was a question of law for resolution by the military judge, rather than an element of an offense requiring a factfinding panel or jury to weigh the evidence.
Judge Sullivan’s conclusion that this is a harmless-error case is inconsistent with Ned-er, which provided that omission of an element could be viewed as harmless only when “supported by uncontroverted evidence” on the question of materiality in tax-fraud charges. 527 U.S. at 18, 119 S.Ct. 1827. If, as Judge Sullivan suggests, the issue of “lawfulness” of an order is a matter which involves introduction of evidence to be weighed by the members, appellant clearly produced at trial a large volume of material contesting the lawfulness of the order. Had this been a question for the members of the court-martial panel, it would have been within their province to analyze the controverted material and reach a judicially unreviewable decision to acquit appellant. Similar considerations apply to Senior Judge Everett’s separate opinion on this point. Both opinions apply Neder in a manner that discounts the large volume of material submitted by appellant contesting the lawfulness of the order, which would be more than sufficient to go before a panel if this were an element for resolution by the members. In rejecting that material, they effectively treat the question as a matter of law rather than as an element of an offense. As a result, both reach the conclusion — with which we agree — “that the order to wear the UN patches and cap was lawful, i. e., it was properly authorized, related to a military duty, and violated no applicable service uniform regulations.” 55 MJ at 128.
ISSUE III — LEGALITY OF THE ORDER
This Court reviews the question of whether the military judge correctly determined that an order was lawful on a de novo basis. 48 MJ at 277. The test for assessing the lawfulness of an order under Article 92 comes from paragraph 14c(2)(a)(iii), Part IV, Manual for Courts-Martial, United States (1995 ed.) which states in pertinent part:
The order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service. The order may not, without such a valid military purpose, interfere with private rights or personal affairs. However, the dictates of a person’s conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order.
See United States v. Hughey, 46 MJ 152, 154 and n. 2 (1997).
Orders are clothed with an inference of lawfulness. See Hughey, 46 MJ at 154; United States v. Nieves, 44 MJ 96, 98 (1996). “An order requiring the performance of a military duty or act may be inferred to be lawful and it is disobeyed at the peril of the subordinate. This inference does not apply to a patently illegal order, such as one that directs the commission of a crime.” Para. 14e(2)(a)(i), Part IV, Manual, supra (1995 ed.). Appellant has the burden to establish that the order is not lawful. Hughey, 46 MJ at 154; United States v. Smith, 21 USCMA 231, 234, 45 CMR 5, 8 (1972).
*107 We hold that the military judge did not err in determining that the order given to appellant to wear his uniform with UN accoutrements was lawful. The military judge correctly determined that the evidence presented by appellant did not overcome the presumption of lawfulness given to military orders and that the order related to military duty.
Appellant argues that (1) the UN insignia violates Army uniform regulations (AR 670-1) by transferring his allegiance to the United Nations, 50 MJ at 734, and (2) the order stems from an illegal deployment of the Armed Forces because President Clinton misrepresented the nature of the deployment to Congress and failed to comply with the United Nations Participation Act [UNPA].[8] 50 MJ at 736. These arguments fail because they would unacceptably substitute appellant’s personal judgment of the legality of an order for that of his superiors and the Federal Government.
This Court has held that an Air Force Captain disobeyed a lawful order when he refused to fly as a training instructor on a fighter plane that was used in Vietnam. United States v. Noyd, 18 USCMA 483, 485-86, 40 CMR 195, 197-98 (1969). The Noyd court noted that “[military service is ... a matter of status,” like becoming a parent, rather than just a contractual relationship and that status establishes special duties between the soldier and the Government. 18 USCMA at 490, 40 CMR at 202. It further noted that “the fact that a person in a military status determines that he has undergone a change of conscience does not, at that instant and from that time on, endow him with the right to decide what orders are compatible with his conscience.” 18 USCMA at 491, 40 CMR at 203.
The Supreme Court has recognized the importance of the military mission over the beliefs of the individual soldier on the specific issue of uniform requirements. The Court held that Air Force regulations that prohibited wearing a yarmulke are not prohibited by the First Amendment, “even though their effect is to restrict the wearing of the headgear required by his religious beliefs.” Goldman v. Weinberger, 475 U.S. 503, 510, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). The Court reasoned that “[t]he desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment.” Id. at 509, 106 S.Ct. 1310. The Court stated:
The considered professional judgment of the Air Force is that the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission. Uniforms encourage a sense of hierarchical unity____ The Air Force considers them as vital ... because its personnel must be ready to provide an effective defense on a moment’s notice; the necessary habits of discipline and unity must be developed in advance of trouble.
Id. at 508, 106 S.Ct. 1310. Based on this reasoning, we conclude that uniform requirements are considered essential to the military mission for the purpose of determining lawfulness.
Although the Goldman decision was overtaken by statute, 10 USC § 774, which now permits wearing religious apparel under certain conditions, its reasoning on uniform requirements is still sound. If uniform requirements relate to military duty, then an order to comply with a uniform requirement meets the “military duty” test set forth in paragraph 14c(2)(a)(iii).
We recently considered the issue of the “military duty” requirement in finding lawftd an order given to a Marine not to drive his personal vehicle because he had been diagnosed with narcolepsy. United States v. McDaniels, 50 MJ 407 (1999). Distinguishing that case from orders held to be illegal, such as not to drink alcohol or speak to other *108 soldiers, see eases cited at 50 MJ at 408, we held that the order in McDaniels was within military authority because it protected other persons. In appellant’s case, it is difficult to think of a requirement more necessary to promoting the basic FYROM UNPREDEP military mission or to safeguarding discipline and morale of deployed troops than uniform requirements. See United States v. Young, 1 MJ 433, 435 (CMA 1976)(identification of personnel and development of esprit de corps justify military uniform requirements for hair cuts).
It is not a defense for appellant to claim that the order is illegal based on his interpretation of applicable law. An order is presumed to be lawful and the defense has the burden to prove illegality unless the order is “palpably illegal on its face.” United States v. Kapla, 22 CMR 825, 827 (AFBR 1956) quoting Winthrop’s Military Law and Precedents 585-76 (2d ed.1920 Reprint). This does not, however, allow a soldier to disobey an order because he believes it to be palpably illegal. A case remarkably similar to this one is United States v. Wilson, 19 USCMA 100, 41 CMR 100 (1969). Private Wilson was denied conscientious-objector status and, after an unauthorized absence, wrote a statement explaining, in part, “I will refuse to wear the uniform of a soldier ever again. I am doing this out of my deeply felt convictions ... and because the Army has given me no other alternative.” 19 USCMA at 100-101, 41 CMR at 100-01. When he later refused to obey an order to wear his uniform, he was charged with willful disobedience. This Court upheld an instruction that personal scruples were not a defense. Citing United States v. Noyd, supra, the Court in Wilson reasoned that personal beliefs could not justify or excuse disobedience by a soldier of a lawful order.
His position is like ’that of the civilian whose religion or conscience is in conflict with lawful orders of the Government ... [T]o allow scruples of personal conscience to override the lawful command of constituted authority would “in effect ... permit every citizen to become a law unto himself.” Reynolds v. United States, 98 U.S. 145, 167, 25 L.Ed. 244 (1878). As Noyd indicated, the freedom to think and believe does not excuse intentional conduct that violates a lawful command.
19 USCMA at 101, 41 CMR at 101. The Court in Noyd also noted that allowing private judgment by a soldier as to which orders to obey would be “unthinkable and unworkable,” and would mean that “the military need for his services must be compromised.” 18 USCMA at 491, 40 CMR at 203. Appellant’s arguments are essentially the same ones that were made there, and they should be rejected on the same basis.
We recently reiterated the limited nature of the grounds upon which the lawfulness of an order may be challenged in the context of denied conscientious-objector status. We determined that there was no- constitutional right or- statutory provision that gave an appellant “authority for a self-help remedy of disobedience.” United States v. Johnson, 45 MJ 88, 92 (1996), citing United States v. Lenox, 21 USCMA 314, 319, 45 CMR 88, 93 (1972).
ISSUE IV — APPLICATION OF THE POLITICAL QUESTION DOCTRINE
The Supreme Court has long recognized the principle of “nonjusticiability”: meaning that courts of law should decline to exercise them authority to decide matters where judicial intervention is deemed inappropriate. Based upon the Constitutional principle of separation of powers in the three branches of Government, judicial review of “a political question” is precluded where the Court finds one or more of the following:
a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a po *109 litical decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker v. Carr, 369 U.S. 186, 217, 218, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); see also Float v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
The Constitution assigns specific military responsibilities to the Executive and Legislative branches of the Government. The President is Commander-in-Chief of the Armed Forces,[9] but Congress has the power to declare war and to organize, arm, and govern the military.[10]
The determination whether lawfulness of the order to deploy is a political question and thus nonjusticiable is reviewed on a de novo standard. Padgett, 48 MJ at 277.
While the military judge determined that the order to wear the U.N. insignia was lawful, he properly declined to rule on the constitutionality of the President’s decision to deploy the Armed Forces in FYROM as a nonjusticiable political question. Courts have consistently refused to consider the issue of the President’s use of the Armed Forces. Two recent examples from the Persian Gulf War era are Ange v. Bush, 752 F.Supp. 509 (D.D.C.1990), and United States v. Huet-Vaughn, 43 MJ 105 (1995). In the Ange case, the District Court declined to rule on the legality of deployment of troops in the Persian Gulf despite inconsistent views of Congress and the President. 752 F.Supp. at 512. In HuetAVaughn, we reaffirmed the idea that personal belief that an order is unlawful cannot be a defense to a disobedience charge, holding: “The duty to disobey an unlawful order applies only to a positive act that constitutes a crime that is so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness.” 43 MJ at 114 (internal quotation marks omitted). The Court further upheld the military judge’s decision not to consider evidence relating to the legality of the decision to deploy the Armed Forces. 43 MJ at 115.
The basic nature of the separation-of-powers issue was also discussed in a Vietnam-era case where soldiers disobeyed an order to board a sedan for further transportation to Vietnam on the grounds that American involvement there was itself illegal. United States v. Johnson, 17 USCMA 246, 247, 38 CMR 44, 45 (1967). This Court noted that the Supreme Court refused to consider challenges to the President’s use of the armed forces abroad. In addition, the Court distinguished Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), since it involved use of military power in a purely domestic dispute. The Court noted Justice Jackson’s concurrence in Youngstown Sheet and Tube Co., where he stated: “I should indulge the widest latitude of interpretation to sustain [the President’s] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society.” 343 U.S. at 645, 72 S.Ct. 863.
Under these standards, we hold that this question qualifies as a nonjusticiable political question.
The decision of the United States Army Court of Criminal Appeals is affirmed.

. Appellant also challenged COL Kwist because he read newspaper articles concerning this case.
*99 The granted issue, however, only addresses that part of appellant’s objection concerning COL Kwist’s having ordered a subordinate to deploy to Macedonia. Hence, our review is limited by the granted issue.

. RCM 912(f)(l)(N) states that a member should be excused when it appears that the person "[sjhould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality.”

. The Navy and Marines were governed by the Articles for the Government of the Navy, W. Generous, Swords and Scales 10-11 (1973), and did not have a "law officer until 1951." Hearings, supra [— MJ at (12) ] at 1153.

. Similar considerations apply with respect to W. De Hart, Obsetvations on Military Law and the Constitution and Practice of Courts-Martial (1846), cited in the separate opinion, -MJ at (9-10), which was published a half-century before the 1896 original publication of Winthrop’s second edition. The separate opinion also relies on J. Snedeker, Military Justice Under the Uniform Code 599 (1953),-MJ at (9). Snedeker’s discussion of lawfulness is not based upon any decisions under the Uniform Code of Military Justice requiring the military judge to treat lawfulness as an element rather than as a question of law. The sole citation in Snedeker is to a pre-UCMJ 1945 court-martial, see id. at 599 n. 50, which involved the routine issue as to whether an order was lawful, and did not address the allocation of responsibilities between the court-martial and the law officer or military judge — a position that had not been established in 1945.

. Art. 19 provides in part:
Special courts-martial may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by this chapter [10 USCS §§ 801 et seq.] except death, dishonorable discharge, dismissal, confinement for more than six months, hard labor without confinement for more than three months, forfeiture of pay exceeding two-thirds pay per month, or forfeiture of pay for more than six months. A bad-conduct discharge, confinement for more than six months, or forfeiture of pay for more than six months may not be adjudged unless a complete record of the proceedings and testimony has been made, counsel having the qualifications prescribed under section 827(b) of this title [10 USCS § 827(b)] (article 27(b)) was detailed to represent the accused, and a military judge was detailed to the trial, except in any case in which a military judge could not be detailed to the trial because of physical conditions or military exigencies. In any such case in which a military judge was not detailed to the trial, the convening authority shall make a detailed written statement, to be appended to the record, stating the reason or reasons a military judge could not be detailed.

. In Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the Supreme Court again addressed "materiality,” in the context of mail fraud, wire fraud, and bank fraud, under 18 USC §§ 1341, 1343, and 1344. The Neder opinion makes clear that materiality is a fact laden concept and includes a finding of fact that "a reasonable man would attach importance” to the matter or “the maker of the representation knows or has reason to know ... the matter is important.” 527 U.S. at 22 n. 5, 119 S.Ct. 1827, citing Restatement (2d) of Torts § 538 (1976).

. Winthrop recognized that point when he noted, "The word 'lawful’ is indeed surplusage, and would have been implied from the word ‘command’ alone, but, being used, it goes to point the conclusion affirmed by all the authorities that a command not lawful may be disobeyed....” Winthrop, supra, at 575.

. As we will rule on Issue IV (see 55 MJ at 109) that the lawfulness of the order to deploy troops as part of the U.N. mission is beyond judicial review because it is a political question, we will decline to address any aspect of appellant’s argument on Issue III that implicates this issue.

. U.S. Const. Art. II § 2.

. U.S. Const. Art. I § 8, cl. 11-14.