# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 16, 2006   Decided May 23, 2006

No. 05-5023

UNITED STATES *EX REL*. MICHAEL G. NEW,
APPELLANT

V.

DONALD H. RUMSFELD,
SECRETARY OF DEFENSE, AND
FRANCIS J. HARVEY, SECRETARY OF THE ARMY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 96cv00033)

———

*Herbert W. Titus* argued the cause for appellant. With him on the briefs were *Henry L. Hamilton*, *William J. Olson*, and *John S. Miles*.

*Kevin K. Robitaille*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan* and *R. Craig Lawrence*, Assistant U.S. Attorneys.

Before: RANDOLPH and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:   Michael G. New, formerly a medical specialist in the United States Army, was convicted by a court-martial of violating a lawful order to add United Nations insignia—a shoulder patch and a field cap—to his basic uniform.   The Army Court of Criminal Appeals ("Court of Criminal Appeals") and the Court of Appeals for the Armed Forces ("Court of Appeals") affirmed.   New's collateral attack charges several errors in the military courts' analysis of the lawfulness of the uniform order.   Because New fails to identify fundamental defects in the military courts' resolution of his claims, we affirm the district court's denial of relief.

\* \* \*

Shortly after he learned during the summer of 1995 that his unit would be deployed to the Republic of Macedonia as part of the United Nations Preventive Deployment Force, New voiced concerns about the lawfulness of the Army's participation in the mission.   In particular, he was troubled that wearing U.N. insignia as part of his uniform would manifest an involuntary or fictional shift in his allegiance from the government of the United States to the United Nations.   Although his superiors discussed these concerns with him, they failed to alleviate them.

Eventually New's battalion commander issued—and his company commander repeated—an order to begin wearing a special U.N. mission uniform at a battalion formation on October 10, 1995.   The uniform consisted of the ordinary United States Army battle dress uniform plus a blue U.N. patch sewn on one shoulder and a blue U.N. cap.   New

reported for the formation on the scheduled date wearing a uniform that lacked these features, and his superiors immediately removed him from the formation. Although his battalion commander offered him a second chance to comply with the uniform order, New declined.

New was court-martialed and charged with violating Article 92(2) of the Uniform Code of Military Justice (codified at 10 U.S.C. § 892(2)), which provides that any person who, "having knowledge of any . . . lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order . . . shall be punished as a court-martial may direct." New's defense focused on the lawfulness of the order—specifically its consistency with Army Regulation 670-1 (1992) ("AR 670-1"), which permits commanders to require uniform modifications "to be worn within [a] maneuver area," par. 2-6d, or "when safety considerations make it appropriate," par. 1-18, and with Article I, Section 9, of the Constitution, which prohibits any person's acceptance of, inter alia, any emolument from a foreign state without congressional consent. New also argued that the uniform order couldn't be lawful because the Army's participation in the U.N. mission was itself unlawful, asserting various statutory and constitutional grounds discussed below.

The military judge—a law officer presiding over the panel but not serving as one of its members—rejected both sets of arguments: he concluded that the order was consistent with AR 670-1 and that the legality of the deployment was a nonjusticiable political question. The court-martial sentenced New to a bad-conduct discharge.

On appeal to the Court of Criminal Appeals, New argued that the military judge erred in ruling that the lawfulness of the order was a legal question for him to decide rather than an element of the offense to be decided by the "military jury"

4

(the term that we use, following the Court of Appeals, as shorthand for the court-martial panel). *United States v. New*, 55 M.J. 95, 103 (C.A.A.F. 2001) ("CAAF Op."); see also *id*. at 117 & n.2 (Sullivan, J., concurring). And he argued that the military judge's conclusion on the merits was erroneous. The Court of Criminal Appeals rejected these claims and affirmed New's conviction and sentence. *United States v. New*, 50 M.J. 729 (A. Ct. Crim. App. 1999) ("ACCA Op."). The Court of Appeals then granted review and also affirmed. CAAF Op., 55 M.J. at 109.

New had filed a petition for a writ of habeas corpus in federal district court shortly before his court-martial. The district court dismissed that petition on the ground that New had failed to exhaust his remedies in the pending court-martial action, *United States* ex rel. *New v. Perry*, 919 F. Supp. 491 (D.D.C. 1996), and we affirmed, *New v. Cohen*, 129 F.3d 639 (D.C. Cir. 1997). After the Court of Criminal Appeals and the Court of Appeals both affirmed his conviction, New returned to the district court. The district court dismissed the petition, finding that each of New's challenges fell outside the scope of collateral review, raised a nonjusticiable political question, or lacked merit as a matter of law. *United States* ex rel. *New v. Rumsfeld*, 350 F. Supp. 2d 80, 102 (D.D.C. 2004) ("District Ct. Op."). New appeals.

\* \* \*

We begin with jurisdiction and the related issue of the scope and standard of review. New, the government, and the district court have all assumed that jurisdiction rests on 28 U.S.C. § 2241, which authorizes federal courts to grant writs of habeas corpus. See District Ct. Op., 350 F. Supp. 2d at 88 n.4, 89; Brief for Appellants at 1; Brief for Appellees at 1. But § 2241(c) precludes granting the writ unless the petitioner

is in custody. Upon conviction by court-martial New received a bad-conduct discharge; as he is not in custody, § 2241 can't supply subject matter jurisdiction. This is not fatal, however, because the Supreme Court has held that Congress didn't intend to confine collateral attacks on court-martial proceedings to § 2241. *Schlesinger v. Councilman*, 420 U.S. 738, 748-53 (1975). Thus the district court had subject-matter jurisdiction to hear New's collateral attack under § 1331 (which New's second amended complaint invoked).

The standard of our review is more tangled. In *Councilman* the Supreme Court not only confirmed jurisdiction in the absence of custody, but also said that collateral relief was barred unless the judgments were "void." *Id*. at 748. And that question "may turn on [1] the nature of the alleged defect, and [2] the gravity of the harm from which relief is sought," *id*. at 753. Specifically, the defect must be "fundamental," for "[a] judgment . . . is not rendered void merely by error." *Id*. at 747. Moreover, "both factors must be assessed in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Id*. at 753. Because *Councilman* ultimately denied review pending the court-martial, this standard was not part of the holding, but our circuit later adopted it for non-habeas review of court-martial judgments. *Priest v. Secretary of the Navy*, 570 F.2d 1013, 1016 (D.C. Cir. 1977).

The Supreme Court pitched the *Councilman* standard as more deferential than habeas review of military judgments, which it has in turn described as no less deferential than habeas review of state court judgments. This first point was explicit in *Councilman* itself, where the Court said: "[G]rounds of impeachment cognizable in habeas proceedings may not be sufficient to warrant other forms of collateral relief." 420 U.S. at 753. The second point is part of the

Court's analysis in *Burns v. Wilson*, 346 U.S. 137 (1953). There, reviewing court-martial death sentences allegedly based on coerced confessions and "an atmosphere of terror and vengeance," *id*. at 138, the Court through a four-justice plurality described military habeas as follows: "It is the limited function of the civil courts to determine whether the military have given fair consideration" to each claim raised by petitioners. *Id*. at 144. As to factfinding, the plurality said that Article III courts should not be in the business of "reexamin[ing] and reweigh[ing] each item of evidence of the occurrence of events which tend to prove or disprove one of the allegations in the applications for habeas corpus." *Id*. The plurality concluded that the petitioners failed to show that the military review process was "legally inadequate" to resolve their constitutional claims and affirmed. *Id*. at 146. (Two additional justices concurred in the result, one of them writing that the Supreme Court's role was limited to assessing the military courts' jurisdiction. *Id*. at 146-48.) In setting out this standard, the plurality explained that the Court must be at least as deferential as it is in the civilian habeas context, for in "military habeas corpus cases themselves, *even more than in state habeas corpus cases*, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted." *Id*. at 142 (emphasis added).

The uncertainty implied in these rankings of deference level is compounded by the evolution of habeas review over time. Until the Supreme Court's decision in *Johnson v. Zerbst*, 304 U.S. 458 (1938), the scope of habeas corpus review was equally narrow in both military and civilian cases—limited to verifying personal and subject-matter jurisdiction. In *Johnson*, a civilian federal habeas corpus case, the Supreme Court expanded the scope of jurisdictional challenges by holding that the trial court could lose

jurisdiction by failing to provide constitutionally-guaranteed counsel to the defendant, *id.* at 468, and this developed into explicit review for constitutional violations. See *Calley v. Callaway*, 519 F.2d 184, 195-96 (5th Cir. 1975) (en banc) (citing *Waley v. Johnston*, 316 U.S. 101 (1942), and *House v. Mayo*, 324 U.S. 42 (1945)). *Burns* took military habeas review onto a similar path, though not to the same degree.

As the military habeas standard of review at one time followed review of state court judgments toward *less* deference, perhaps it (and other collateral review of military decisions) should follow the current path toward *more*. In light of the *Burns* Court's view that military habeas review must be at as least as deferential as habeas review of state criminal judgments, the Third Circuit has held that the former enjoy at least as much deference as the latter do now, under the statutory standards adopted in the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). See *Brosius v. Warden*, 278 F.3d 239, 245 (3d Cir. 2002) (citing 28 U.S.C. § 2254(d)-(e)). But to the extent that Congress's revision of the standards for state court judgments arose out of special history and circumstances, its decision to tighten in that context may reflect no judgment at all about collateral review of court-martial judgments.

We trace these steps merely as a caution. Except insofar as a standard may be quite specific, such as AEDPA's requirement of a violation of "clearly established Federal law, as determined by the Supreme Court of the United States," see 28 U.S.C. § 2254(d)(1), we have serious doubt whether the judicial mind is really capable of applying the sort of fine gradations in deference that the varying formulae may indicate. See *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995). It suffices for our purposes to repeat *Councilman*'s statement that errors must be fundamental to void a court-martial judgment on collateral review. And in

light of *Councilman*'s point that non-habeas review is if anything more deferential than habeas review of military judgments, 420 U.S. at 753, a military court's judgment clearly will not suffer such a defect if it satisfies *Burns*'s "fair consideration" test.

\* \* \*

New first argues that the military courts violated his Fifth Amendment rights to due process by ruling that the lawfulness of the uniform order he violated was not an element of the offense—and thus not to be decided by the military jury. He evidently invokes the Fifth Amendment for two reasons. First, it is undisputed that the Sixth Amendment doesn't create any jury right in courts-martial. See *Ex parte Quirin*, 317 U.S. 1, 38-41 (1942). Second, the Court's decision in *United States v. Gaudin*, holding that the issue of materiality must be found by a jury beyond a reasonable doubt (it was conceded that materiality was an element of the false statements offense defined in 18 U.S.C. § 1001), rested on the Fifth Amendment as well as the Sixth. 515 U.S. 506, 509-10 (1995). Here, by virtue of a *statute*, 10 U.S.C. § 851(c), any element of the offense must be submitted to the military jury for evaluation under the reasonable doubt standard. Thus, for the Court of Appeals, the *New* case presented the inverse of *Gaudin*: classification of the factor (lawfulness) as an "element" was unclear, but once the classification was made, the judge-jury allocation was indisputable. 55 M.J. at 104. Other than the idea that lawfulness must be an element of the offense (coupled with § 851's requirement), New appears to offer no legal reason why the lawfulness issue should have gone to the military jury.

We find no fundamental defect in the Court of Appeals' conclusion that the lawfulness of an order is not a separate and

distinct element of the offense, but rather is an issue for the military judge. *Id*. at 105. Identifying the elements of a statutory provision defining a crime is an exercise in statutory interpretation. The Court of Appeals started with the text and then turned to traditional aids in statutory interpretation: It considered—and identified powerful support in—the meaning of the key terms "lawful" and "order," the relevant legislative history, previous decisions of military courts, and the Manual for Courts-Martial. *Id*. at 100-01. And it distinguished lawfulness from "wrongfulness" and "materiality," which must go to the military jury when a servicemember is charged with violating 18 U.S.C. § 1001 under 10 U.S.C. § 934. CAAF Op., 55 M.J. at 105. Finally, the Court of Appeals reasoned that if the lawfulness of an order were an element of the offense, "the validity of regulations and orders of critical import to the national security would be subject to unreviewable and potentially inconsistent treatment by differing court-martial panels." *Id*. at 105. One judge contrasted the resulting "patchwork quilt" with "the unity and cohesion that is critical to military operations." See *id*. at 110 (Effron, J., concurring).

New argues that the Court of Appeals' interpretation failed to apply the two-step methodology set out by the Supreme Court in *Neder v. United States*: "[W]e first look to the text of the statutes at issue," *id*. at 20, and then look to the "accumulated settled meaning under the common law" if such a meaning exists. 527 U. S. 1, 21 (1999). But there the issue was whether the language implied the existence of an element, whereas here the statute specified "*lawful* order," and the issue was that term's role—whether it set out an element of the offense or, as the Court of Appeals found, simply underscored the accused's "opportunity . . . to challenge the validity of the regulation or order." CAAF Op., 55 M.J. at 105. New also objected that the Court of Appeals' conclusion conflicts with a statement in *Unger v. Ziemniak*, 27 M.J. 349

(C.M.A. 1989), that in "a prosecution for disobedience, lawfulness of the command is an element of the offense." *Id*. at 358. But the Court of Appeals reasonably found that the remark was wholly unnecessary to the judgment. CAAF Op., 55 M.J. at 102. In any event, the Court of Appeals is "free to refine and develop its prior decisions" without our interference. *Priest*, 570 F.2d at 1019.

New also objects to the military courts' substantive conclusion that the uniform order was lawful in the sense that it was consistent with AR 670-1. That regulation allows commanders to require "organizational protective or reflective items . . . with the uniform when safety considerations make it appropriate," par. 1-18, and allows commanders to prescribe the uniform "to be worn within [a] maneuver area," par. 2-6d. The military judge found that "[t]he wearing of distinctive and identifiable uniforms or uniform accessories easily recognizable in a combat environment or potential combat environment has a practical combat function which may enhance both the safety and/or tactical effectiveness of combat-equipped soldiers performing tactical operations," and thus that the U.N. insignia "had a function specifically designed to enhance the safety of United States armed forces in Macedonia." Court-Martial Transcript at 426; see also CAAF Op., 55 M.J. at 107 (reaching same conclusion as military judge).

New acknowledges the presumption of lawfulness that attaches to military orders, CAAF Op., 55 M.J. at 106, but he contests the Court of Appeals' conclusion that he failed to overcome that presumption, *id*. at 107. He argues that the government failed to submit any evidence justifying the uniform order by reference to safety considerations or maneuver areas. He himself did not proffer any evidence on these issues. Before us, he instead points to a Stipulation of Fact concerning a totally unrelated provision of AR 670-1,

which states that the uniform modifications "ha[d] *not* been approved by the Director of [t]he Institute of Heraldry, U.S. Army, as required and mandated under the provisions of paragraphs 27-16a and b of Army Regulation 670-1." We can hardly fault the military courts' judgment that this stipulation failed to rebut the presumption that safety considerations justified the uniform order. We note that Judge Sullivan of the Court of Appeals, who disagreed with the majority on the judge-jury issue, found the allocation of the issue to the judge a harmless error because the commanders had indisputably ordered use of blue U.N. patches and caps "as part of the operations plans for the mission and for safety purposes." 55 M.J. at 127 (Sullivan, J., concurring in the result). Again, we can find no fundamental defect in the Court of Appeals' consideration of the issue.

New appears to rely on the same stipulation as evidence that the uniform order violated the Emoluments Clause of Article I, Sec. 9 of the Constitution. ("[N]o Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."). But he offers no legal analysis supporting his belief the U.N. patch and cap fall within the scope of the Emoluments Clause's prohibition on receipt of various possible honors or benefits from foreign states, and we find the claim a stretch at best. New argues that the claim did not receive fair consideration because it "was not litigated at all," see Brief for Appellants at 45; see also Reply Brief for Appellants at 12, but the military judge heard arguments on the subject, see, e.g., Court-Martial Transcript at 387, 391, 406-07, 417, ruled that the U.N. patch and cap "were neither gifts from a foreign government nor received by Specialist New from a foreign government," and observed that Congress appeared to authorize their receipt in a provision of the United Nations Participation Act, *id*. at 428. For claims as weak as

this, summary disposition is completely consistent with fair consideration.  See, e.g., *King v. Moseley*, 430 F.2d 732, 734-35 (10th Cir. 1970).

We turn next to New's arguments that the uniform order was unlawful because it was issued pursuant to a military deployment that was itself unlawful on several grounds.  As he sees it, the deployment violated the United Nations Participation Act because the President incorrectly characterized the deployment as noncombatant and therefore governed by 22 U.S.C. § 287d-1; in fact, New claims, it was a combatant operation that required Congressional approval under 22 U.S.C. § 287d.  He further argues that because during the deployment he would be placed under the operational control of U.N. officials, the deployment violated the Commander-in-Chief Clause, the Appointments Clause, and the Thirteenth Amendment.  Brief for Appellant at 13.

The military judge rejected these attacks on the deployment on two grounds—what appears to be a standing analysis, i.e., finding that the dispute over the uniform's legality "did not effectively call into issue the underlying legality of the deployment," Court-Martial Transcript at 429; see also *id*. at 432, and the political question doctrine, *id.*  The Criminal Court of Appeals found consideration barred by the latter, ACCA Op., 50 M.J. at 737, 739, as did the Court of Appeals, CAAF Op., 55 M.J. at 108-109.  As either want of standing or the political question doctrine would prevent adjudication on the merits, we may resolve them in any order. See *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits"); *Hwang Geum Joo v. Japan*, 413 F.3d 45, 47-48 (D.C. Cir. 2005).  Finding that the military courts' use of the political question doctrine deserves deference, we do not address standing.

Our courts have adjudicated claims based on two of the constitutional provisions New invokes—the Appointments Clause and the Thirteenth Amendment—without interposing the political question doctrine. See, e.g., *Weiss v. United States*, 510 U.S. 163 (1994) (whether method of appointing military judges violates Appointments Clause); *Selective Draft Law Cases*, 245 U.S. 366 (1918) (whether military draft law violates Thirteenth Amendment). But no such adjudication has occurred in the context of a court-martial defendant who had refused to obey an order that he claimed was illegal because the Appointments Clause or the Thirteenth Amendment invalidated the deployment underlying the disobeyed order.

Whatever the application of the political question doctrine to these four challenges to a deployment order in an otherwise properly framed civil suit, the military justice context compels a somewhat broader doctrine in light of the implications of any alternative view. As the Court of Appeals observed, nothing gives a soldier "authority for a self-help remedy of disobedience." 55 M.J. at 108 (quoting *United States v. Johnson*, 45 M.J. 88, 92 (C.A.A.F. 1996)). Two of the canonical factors from *Baker v. Carr*, 369 U.S. 186, 217 (1962), "an unusual need for unquestioning adherence to a political decision already made," 369 U.S. at 217, and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question," *id.*, are uniquely powerful when the context is a soldier's use of the "self-help remedy of disobedience." Also supporting a broader sweep to the political question doctrine in military trials is the point made by Judge Effron in his concurring opinion—that the doctrine "ensur[es] that courts-martial do not become a vehicle for altering the traditional relationship between the armed forces and the civilian policymaking branches of government" by adjudicating the legality of political decisions. *Id.* at 110. Thus we find no defect in the

Court of Appeals' application of the political question doctrine, even though that application might be highly contestable in another context. Compare *Campbell v. Clinton*, 203 F.3d 19, 24-28 (D.C. Cir. 2000) (Silberman, J., concurring) (finding that no "judicially discoverable and manageable standards" exist for application of the Constitution's war powers clause or the War Powers Resolution, 50 U.S.C. § 1541 *et seq.*), with *id*. at 37-41 (Tatel, J., concurring) (concluding that such standards do exist). Given the threat to military discipline, see Court-Martial Transcript at 433, we have no difficulty accepting the military courts' reliance on the doctrine.

* * *

For the foregoing reasons, the district court's dismissal is

*Affirmed*.