The **UNITED STATES ex rel. Michael G. NEW, Petitioner,**

v.

Donald H. **RUMSFELD, Secretary of Defense, and Les Brownlee, Acting Secretary of the Army,**[1] **Respondents.**

No. CIV.A.96–0033(PLF).

United States District Court, District of Columbia.

Dec. 22, 2004.

---

1. Secretary of Defense Donald Rumsfeld and Acting Secretary of the Army Les Brownlee have been substituted as the named defendants under Rule 25(d) of the Federal Rules of Civil Procedure.

Henry L. Hamilton, Ratchford & Hamilton LLP, Columbia, SC, Herbert W. Titus, Troy A. Titus, P.C., Virginia Beach, VA, John Stewart Miles, William J. Olson, P.C., McLean, VA, Michael Paul Farris, Home School Legal Defense Association, Washington, DC, Ronald D. Ray, Crestwood, KY, William J. Olson, William J. Olson, P.C., McLean, VA, for Plaintiff.

Robert Lawrence Shapiro, Spriggs & Hollingsworth, Thomas M. Ray, Claes H. Lewenhaupt, Joel E. Wilson, Washington, DC, for Defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

The petitioner in this case, Specialist Michael G. New, is an enlisted member of

the United States Army convicted by court-martial of disobeying a lawful order under Article 92 of the Uniform Code of Military Justice and sentenced to a bad conduct discharge. Mr. New has filed a petition for a writ of habeas corpus, asking the Court to set aside his conviction based on the invalidity of the order he was convicted of disobeying, and the improper submission of that order's lawfulness to the military judge rather than to the court-martial panel.

Respondents, the Secretary of Defense and the Secretary of the Army, have filed a motion to dismiss petitioner's second amended complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Respondents argue that all of petitioner's claims are either outside the scope of collateral review or are nonjusticiable under the political question doctrine. The Court agrees with respondents with respect to some but not all of petitioner's claims; however, because the Court finds petitioner's remaining claims to be without merit, it will grant respondents' motion to dismiss.

## I. BACKGROUND

While serving in the United States Armed Forces as a Medical Specialist in 1995, petitioner Michael G. New was informed that his unit would be dispatched to the Republic of Macedonia to become part of the United Nations Peacekeeping Force in that country. See New v. Cohen, 129 F.3d 639, 641 (D.C.Cir.1997). Upon learning that he would be required to wear a U.N. shoulder patch on his uniform and distinctive U.N. headgear while in Macedonia, petitioner informed his squad leader and his platoon leader that he believed the

uniform to be unlawful and that he would refuse to wear the U.N. uniform components unless convinced that the requirements were justified by United States constitutional authority. See id. Petitioner suggested that in order to avoid a controversy he be granted a transfer to another unit or, as an alternative, receive an honorable discharge. The Army denied both of these requests. See id. On October 10, 1995, petitioner appeared in formation without the U.N. uniform components and in violation of orders from his superior officers. See id. For refusing to obey the order of a military superior, petitioner was charged with an Article 92 violation and the military initiated court-martial proceedings. See id.[2]

### A. Initial Proceedings in this Court

On January 16, 1996, Petitioner petitioned this Court for a writ of habeas corpus and an emergency stay of the court-martial proceeding. The Court declined to stay the military proceedings, finding that petitioner had not shown a likelihood of success on the merits, that the quality of justice in the military courts was not inherently inferior to that provided by Article III courts, and that the public interest was clearly in favor of denying the stay in order to prevent confusion over the lawfulness of peacekeeping deployments in Macedonia. United States ex rel. New v. Perry, Memorandum Opinion and Order 1996 WL 420175 (D.D.C. Jan. 16, 1996). The Court subsequently declined to issue a writ of habeas corpus. See United States ex rel. New v. Perry, 919 F.Supp. 491, 500 (D.D.C.1996). The Court concluded that the principle of comity counsels deference and forbearance when the issues have been presented in

---

**2.** A more extensive discussion of the factual background of this case may be found in both an earlier opinion of this Court, see United States ex rel. New v. Perry, 919 F.Supp. 491, 493–94 (D.D.C.1996), and the D.C. Circuit's subsequent affirmance of this Court's decision. See New v. Cohen, 129 F.3d at 641–43.

adequate, ongoing proceedings in another tribunal with concurrent powers, particularly when the other forum is a military court. "The issues raised in this case," the Court stated, "are within the province of the military tribunals, and there is no need for this Court to 'blaze a trail on unfamiliar ground' when the military court stands ready to consider Specialist New's claims." *Id.* at 499 (*quoting Noyd v. Bond,* 395 U.S. 683, 696, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969)).

The court of appeals affirmed this Court's denial of habeas corpus relief. The appellate court agreed that the interests of comity and the rule of exhaustion mandated that petitioner pursue all remedies available to him within the military justice system before asking an Article III court to consider his arguments. *See New v. Cohen,* 129 F.3d at 642–44, 645. The court held that none of the exceptions to the principles of comity or exhaustion applied to petitioner's situation, *id.* at 644–47, and that following any final decision by the military courts, petitioner "might be able to bring an action in district court seeking nullification of the conviction underlying his bad conduct discharge." *Id.* at 648.

### B. Court–Martial Proceedings and Appeal

While petitioner was pursuing his appeal from this Court's decision, he was charged with disobedience, convicted by court-martial, and sentenced to a bad conduct discharge. *See New v. Cohen,* 129 F.3d at 642. Before trial, petitioner filed three motions to dismiss the charges against him.

The first motion to dismiss argued that the order to wear the U.N. uniform components (the "uniform order") was unlawful because President Clinton's order committing United States forces to the United Nations mission in Macedonia (the "deployment order") was unlawful on several statutory and constitutional grounds. *See* Second Amended Complaint ("2d.Am.Compl.") ¶ 9. Petitioner's second motion asserted that the uniform order was unlawful because it forced petitioner "involuntarily to serve as a United Nations soldier thereby depriving him of his rights as a United States soldier in violation of the Thirteenth Amendment of the United States Constitution." 2d. Am. Compl. ¶ 10. The third motion raised several challenges to the lawfulness of the uniform order. Petitioner claimed that the order violated Article I, Section 9, clause 8 of the United States Constitution (the "Foreign Emoluments Clause"), prohibiting any officeholder of the United States from accepting a present, office, title, or emolument from a foreign state; 5 U.S.C. § 7342 ("Receipt and disposition of foreign gifts and decorations") and 32 C.F.R. § 578.19, its implementing regulation; and Army Regulation 670–1, governing the wear and appearance of army uniforms and insignia. 2d. Am. Compl. ¶ 11. Petitioner also asserted that the uniform order "would subject [petitioner] to commit a crime under Articles 134 UCMJ, and would subject [petitioner] to civil penalties under 5 U.S.C. Section 7342." *Id.*

Prior to trial, the military judge, deciding that the motions to dismiss raised interlocutory matters, ruled that both the uniform order and the deployment order were legal and denied all three motions to dismiss. *See United States v. New,* 50 M.J. 729, 735 (Army Ct.Crim.App.1999) ("*New I* "). As a result, petitioner was precluded at trial from presenting evidence to the court-martial panel challenging the justification for the deployment and the legality of the orders. *See id.* Petitioner did, however, introduce sworn testimony and several exhibits in support of his motions, and the military judge made several findings of fact subsidiary to

the determination of lawfulness. *See id.* at 737–38; Plaintiff's Motion to Reopen Proceeding and Substitute Parties Respondent, and for Leave to File an Amended and Supplemental Petition for a Writ of Habeas Corpus, App. 2 at 422–33 ("Trial Record"). The military judge also found the deployment order's lawfulness to be irrelevant because it was only the uniform order that petitioner was accused of disobeying. *See* Trial Record at 429; *New I*, 50 M.J. at 737–38.

Petitioner subsequently was tried and convicted. Because of the pretrial rulings, his defense was limited to asserting the affirmative defenses of mistake, inability, and obedience to higher orders. *See New I*, 50 M.J. at 735. Petitioner appealed his conviction to the United States Army Court of Criminal Appeals ("ACCA"), which affirmed petitioner's conviction on April 28, 1999, *see New I*, 50 M.J. 729, and then to the United States Court of Appeals for the Armed Forces ("CAAF"), which affirmed the conviction on June 13, 2001. *See United States v. New*, 55 M.J. 95 (U.S. Armed Forces 2001) (*"New II "*).

Petitioner's appeal to the ACCA raised several challenges to the military judge's rulings. Petitioner first contended that the military judge's decision to rule on the lawfulness of the orders as a matter of law, rather than have the court-martial panel decide the question as one of fact, deprived petitioner of his rights under the Fifth and Sixth Amendments. Both appellate courts rejected petitioner's constitutional challenge and affirmed the military judge's ruling as proper under the UCMJ and the military courts' own jurisprudence. *See New I*, 50 M.J. at 738; *New II*, 55 M.J. at 101–02 (*citing United States v. Carson*, 15 USCMA 407, 408, 1965 WL 4684 (1965)).

The ACCA and the CAAF also affirmed the military judge's related ruling that the lawfulness of an order is not an element of the offense of disobedience and that it therefore need not be decided by the court-martial panel. *See New I*, 50 M.J. at 738; *New II*, 55 M.J. at 102–03 (*citing Cox v. United States*, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947), and *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944)). In doing so, the CAAF rejected petitioner's argument that *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), required a contrary holding, characterizing the question of whether the order's lawfulness was an element as a "matter of statutory interpretation in the military justice system," rather a matter of constitutional law. *New II*, 55 M.J. at 104. Citing the legislative history of the UCMJ as well as the need for consistent interpretations of the legality of military orders, the CAAF further held that the lawfulness of an order is a question of law to be decided by the military judge. *See id.* at 105.

Petitioner also challenged on appeal the military judge's ruling that the deployment and uniform orders were lawful. The ACCA, reviewing the matter *de novo*, held that the lawfulness of the deployment order was a nonjusticiable political question and therefore declined to consider petitioner's challenges to the deployment order on the merits. *See New I*, 50 M.J. at 740–41 (*citing Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and *Ange v. Bush*, 752 F.Supp. 509 (D.D.C.1990)). The CAAF upheld this ruling under the principles elaborated by the Supreme Court in *Baker v. Carr*, stating that "[c]ourts have consistently refused to consider the issue of the President's use of the Armed Forces." *New II*, 55 M.J. at 108–09. As to the uniform order, the ACCA, interpreting Army regulations, affirmed the military judge's finding of the order's lawfulness, *New I*, 50 M.J. at 740, and the CAAF affirmed in light of the presumption

of lawfulness that attaches to military orders and petitioner's failure to present to the judge evidence sufficient to rebut that presumption. *See New II,* 55 M.J. at 107–08.

### C. Collateral Review in this Court

His conviction having been affirmed through the military appeals process, petitioner moved in May 2002 to reopen proceedings in this Court. The Court granted petitioner's motion, *see New v. Rumsfeld,* Civil Action No. 96–0033 (D.D.C. June 18, 2002), and petitioner filed an amended complaint on July 7, 2002. In addition to the prayers for relief set forth in the current complaint, the first amended complaint sought an award of back pay and allowances petitioner had been deprived of as result of his court-martial conviction. *See* Amended Complaint at 16. Respondents filed a motion to dismiss the amended complaint for lack of subject matter jurisdiction, arguing that neither the Mandamus Act, 28 U.S.C. § 1361, nor the Declaratory Judgment Act, 28 U.S.C. § 2201 (two of the statutory bases for petitioner's pleas for relief) waives the sovereign immunity of the United States for money damages. *See* Defendant's Motion to Dismiss or, in the Alternative, to Transfer at 3–4. The motion was briefed by the parties, but was mooted by petitioner's filing of a Second Amended Complaint which eliminated his prayer for monetary relief. *See* 2d. Am. Compl. at 16.

The Second Amended Complaint raises four claims. The first is that petitioner was denied his due process right to trial by jury because the question of the lawfulness of the uniform order was decided as a question of law by the military judge. As a matter of due process, petitioner claims, the lawfulness of that order should have been submitted to the court-martial panel and proved by the prosecution beyond a reasonable doubt. *See* 2d. Am. Compl. ¶¶ 39–41.[3] Petitioner's second claim is that he was unconstitutionally denied his due process right to a full defense when the ACCA and the CAAF held that the legality of the deployment order under the Appointments and Commander–in–Chief Clauses of the United States Constitution and the Thirteenth Amendment was a nonjusticiable political question. *See id.* ¶¶ 42–44.

Petitioner's third claim is that the military courts improperly refused to consider on the merits petitioner's challenge that the uniform order violated the Foreign Emoluments Clause of the Constitution in that the wearing of the U.N. patches and headgear would have constituted the acceptance of an emolument from a foreign government. *See* 2d. Am. Compl. ¶¶ 45–49. Petitioner's fourth, alternative claim asserts that petitioner was denied due process of law when the military judge found, without fair support in the record, that the U.N. patch and headgear were justified under military regulations as safety items in a maneuver area. *See id.* ¶¶ 50–56.

Petitioner seeks a declaratory judgment that his court-martial conviction and sentence are null and void because they were obtained in violation of his constitutional rights, as well as injunctive relief in the form of a vacation of his conviction and sentence, reinstatement to the Army at the rank and seniority to which he would be entitled but for the court-martial, and correction of his military record. *See* 2d. Am. Compl. at 16.

Respondents filed a motion to dismiss the second amended complaint for failure

---

**3.** A court-martial consists of a military judge and a court-martial panel, which serves a function roughly analogous to that of a civil- ian jury. See Art. 25, UCMJ, 10 U.S.C. § 825; *Weiss v. United States,* 510 U.S. 163, 167 n. 1, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

to state a claim on April 30, 2004, and the matter was argued before the Court on October 19, 2004. Respondents argue first that all of petitioner's claims involve the legality of the deployment order, a nonjusticiable political question. *See* Defendants' Motion to Dismiss at 5–9 ("Defs'.Mot.Dismiss"). Alternatively, respondents assert that, if the political question doctrine does not bar review of all claims, then petitioner's claims as stated fall outside the limited scope of collateral review of a court-martial conviction. *See id.* at 9–14. In support of this claim, respondents argue that the military judge's ruling on the lawfulness of the orders disobeyed was a procedural, not a constitutional decision, *id.* at 14–19, and that the lawfulness of the uniform order was a factual determination not appropriate for review here.

## II.  DISCUSSION

### A.  Standard on a Motion to Dismiss for Failure to State a Claim

Petitioner brings this action as a petition for habeas corpus, seeking a declaratory judgment, injunctive relief, and a writ of mandamus. Respondents move to dismiss petitioner's second amended complaint for failure to state a claim on which relief can be granted. *See* FED. R. CIV. P. 12(b)(6).[4] On a motion to dismiss under Rule 12(b)(6), the Court must assume the truth of the facts alleged in the complaint, and may grant the motion only if it appears beyond doubt that petitioner will be unable to prove any set of facts that would justify relief. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325, 111 S.Ct. 1842,

114 L.Ed.2d 366 (1991); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir.2002); *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987). The complaint is construed liberally in petitioner's favor, and the Court should grant petitioner the benefit of all inferences that can be derived from the facts alleged. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *accord Andrx Pharmaceuticals v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C.Cir.2001). Nonetheless, the Court need not accept factual inferences drawn by petitioner if those inferences are not supported by facts alleged in the complaint, nor must the Court accept petitioner's legal conclusions. *See National Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir.1996); *Kowal v. MCI Communications Corp.*, 16 F.3d at 1276.

When addressing a motion to dismiss under Rule 12(b)(6), the Court generally may not look outside the facts contained within the four corners of the complaint, *see Gordon v. National Youth Work Alliance*, 675 F.2d 356, 361 (D.C.Cir.1982), unless it treats the motion to dismiss as a motion for summary judgment. *See* FED. R. CIV. P. 12(b); *Currier v. Postmaster Gen.*, 304 F.3d 87, 88 (D.C.Cir.2002); 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.34(2) (3d ed.2002). The Court may, however, "take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment." *Baker v. Henderson*, 150

---

4.  The Supreme Court has enacted special procedural rules for actions challenging a petitioner's custody pursuant to a state court judgment under 28 U.S.C. § 2254, which also may be applied "at the discretion of the United States district court" to other habeas cases, such as this one brought under 28 U.S.C. § 2241. RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS 1(b). Nonetheless, the Federal Rules of Civil Procedure apply in habeas cases "to the extent that the practice in such proceedings is not set forth" in the habeas rules themselves or other statutes "and has heretofore conformed to practice in civil actions." FED. R. CIV. P. 81(a)(2).

F.Supp.2d 17, 19 n. 1 (D.D.C.2001). *See also Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F.Supp.2d 96, 100 n. 5 (D.D.C.2003); *Jacobsen v. Oliver*, 201 F.Supp.2d 93, 110 (D.D.C.2002); 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.34(2) (3d ed.2002). Among other things, a court may take judicial notice of the factual findings of another court as part of the public record. *See Weil v. Markowitz*, 829 F.2d 166, 173 (D.C.Cir. 1987); *accord Dupree v. Jefferson*, 666 F.2d 606, 608 n. 1 (D.C.Cir.1981) (same). Thus, in considering respondents' motion to dismiss for failure to state a claim, the Court may consider the record created by the military courts as well as the factual findings of the court-martial.

### B.  Scope of Review for Collateral Attack on Court–Martial Conviction

Because this is a collateral attack on petitioner's court-martial conviction under 28 U.S.C. § 2241, this Court's review is limited. Just how limited is a matter that demands some clarification.

It has long been held that Article III courts have authority to consider collateral attacks challenging a court-martial tribunal's jurisdiction to try a case. *See In re Grimley*, 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636 (1890) ("It cannot be doubted that the civil courts may in any case inquire into the jurisdiction of a court-martial, and if it appears that the party condemned was not amenable to its jurisdiction, may discharge him from the sentence."). The United States Supreme Court announced the basic principles of an expanded habeas corpus review in *Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). Recognizing that military courts have responsibilities to protect the constitutional rights of accused soldiers, a plurality of the Court in *Burns* declared that it is "the limited function of the civil courts" on habeas corpus review "to determine whether the military have given fair consideration to each of [petitioner's] claims." *Burns v. Wilson*, 346 U.S. at 144, 73 S.Ct. 1045; *see id.* at 142, 73 S.Ct. 1045 ("when a military decision has dealt fully and fairly with an allegation raised in [the application for habeas corpus relief], it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence."). Such review does not allow the federal civil court on a collateral challenge to review the military courts' evidentiary rulings, or to re-weigh the evidence itself. *See id.* at 142, 144, 73 S.Ct. 1045.

*Burns* left open two significant questions: what constitutes "full and fair consideration" of a petitioner's claims, and what kinds of claims are cognizable on habeas review. With respect to the first question, the circuits have arrived at a variety of interpretations. The governing precedent in this Circuit is *Kauffman v. Secretary of the Air Force*, 415 F.2d 991 (D.C.Cir.1969). There the United States Court of Appeals for the District of Columbia Circuit held that the principal opinion in *Burns* did not apply a standard of review of convictions by military tribunals different from that employed in habeas corpus review of state convictions under 28 U.S.C. § 2241. *Id.* at 997. Noting that the Supreme Court has "never clarified the standard of full and fair consideration, and it has meant many things to many courts," the D.C. Circuit held that the "test of fairness requires that military rulings on constitutional issues conform to Supreme Court standards, unless it is shown that conditions peculiar to military life require a different rule." *Id.* Thus, while it is not for this Court to review the military judge's factual findings or evidentiary rulings, it need not defer to constitutional rulings not conforming to "Supreme Court standards."

With respect to the second question left open by *Burns*—the nature of the claims the Court may examine when considering a collateral attack on a decision of a military tribunal—the courts have spoken with less clarity. *Burns*, like *Kauffman*, allowed review of a habeas petitioner's constitutional challenges to a court-martial conviction, but did not consider whether claims of non-constitutional legal error also might be entertained on habeas corpus review.

Petitioner in this case not only claims constitutional error in his court-martial conviction, but also asserts errors in the application of federal statutes and regulations—specifically, that the deployment order violated the United Nations Participation Act, 22 U.S.C. § 287, *et seq.* ("UNPA"), and that the uniform order violated Army uniform regulations. Some of petitioner's claims also implicate the proper interpretation of certain provisions of the Uniform Code of Military Justice. The Court therefore must decide whether it can entertain claims of such non-constitutional error on a petition for habeas corpus challenging a military conviction.

Although both *Burns* and *Kauffman* suggest that this Court's review is not limited to constitutional error, no case in this circuit has explicitly addressed the question of whether claims of non-constitutional legal error in a court-martial proceeding are cognizable on a habeas corpus petition. A number of decisions seem to have assumed without deciding that only constitutional claims are appropriate for collateral review. *See, e.g., Priest v. Secretary of the Navy*, 570 F.2d 1013, 1019 (D.C.Cir.1977) ("On collateral review we are concerned only with fundamental constitutional errors."); *Williamson v. Secretary of the Navy*, 395 F.Supp. 146, 147

(D.D.C.1975); *Staton v. Froehlke*, 390 F.Supp. 503, 505 (D.D.C.1975); *Stolte v. Laird*, 353 F.Supp. 1392, 1395 (D.D.C. 1972).

The Court has uncovered only one appellate case squarely to have considered the issue. In *Allen v. Cantfort*, 436 F.2d 625 (1st Cir.1971), the United States Court of Appeals for the First Circuit declined to read *Burns* to foreclose consideration of all errors of federal statutory law committed by the military courts. Based on the language of the habeas corpus statute, the court in *Cantfort* held that a reviewing court "cannot refuse to consider all alleged errors of law committed by the military without explicit authority for doing so. We cannot read *Burns v. Wilson* as such authority; in mentioning only errors of constitutional magnitude, *Burns* was facing the only question before it." *Allen v. Cantfort*, 436 F.2d at 629 (citations omitted). *See* 28 U.S.C. § 2241(c)(3) (writ shall not extend to a prisoner unless he or she is in custody "in violation of the Constitution or laws or treaties of the United States.").[5] The same may be said of decisions in this circuit: In setting the scope of collateral review, only constitutional claims have been mentioned because only constitutional claims have been raised. *See Priest v. Secretary of the Navy*, 570 F.2d. at 1019; *Kauffman v. Secretary of the Air Force*, 415 F.2d at 995–96; *Williamson v. Secretary of the Navy*, 395 F.Supp. at 147; *Staton v. Froehlke*, 390 F.Supp. at 505; *Stolte v. Laird*, 353 F.Supp. at 1395.

In *Cothran v. Dalton*, 83 F.Supp.2d 58 (D.D.C.1999), Judge Flannery effectively held that non-constitutional claims can be reviewed on collateral attack of military convictions and provided the standard for review of such claims. He expressly held

---

**5.** The court in *Allen* went on to consider and reject petitioner's claim that his court-martial conviction violated Article 45(b) of the UCMJ. *Allen v. Cantfort*, 436 F.2d at 629.

in the disjunctive that "[c]ollateral relief is available where the plaintiff alleges either a constitutional error, a lack of jurisdiction *or* an error 'so fundamental as to have resulted in a miscarriage of justice.'" *Id.* at 66 (emphasis added) (*quoting Calley v. Callaway,* 519 F.2d 184, 199 (5th Cir. 1975)).[6] The decision Judge Flannery cited, *Calley v. Callaway,* in turn relied on and quoted the Supreme Court's opinion in *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). The court in *Calley* noted:

> Most habeas corpus cases have provided relief only where it has been established that errors of constitutional dimension have occurred. But the Supreme Court held in a recent decision that nonconstitutional errors of law can be raised in habeas corpus proceedings where "the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,'" and when the alleged error of law "'presented exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.'" *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974), *quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). Thus, an essential prerequisite of any court-martial error we are asked to review is that it present a substantial claim of constitutional dimension, *or* that the error be so fundamental

as to have resulted in a gross miscarriage of justice.

*Calley v. Callaway,* 519 F.2d at 199 (emphasis added) (footnote omitted).[7] *See also United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979); *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). *Davis* itself made clear that when there is a claim of fundamental error, "there is no support ... for the proposition that a claim is not cognizable [on habeas corpus] merely because it is grounded in the 'laws of the United States' rather than the Constitution." *Davis v. United States,* 417 U.S. at 346, 94 S.Ct. 2298.

■ This Court therefore holds that non-constitutional legal claims—that is, claims arising under federal statutes or regulations—may be considered on collateral review of a military conviction if the application of the statutes or regulations resulted in an error "so fundamental as to have resulted in a miscarriage of justice." *Cothran v. Dalton,* 83 F.Supp.2d at 66.

■ In considering such claims the Court will, however, afford substantial deference to the military courts in their application of military law. As the Supreme Court has noted, "[m]ilitary law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal establishment." *Burns v. Wilson,* 346 U.S. at 140, 73 S.Ct. 1045; *see*

---

**6.** At oral argument, respondents incorrectly interpreted *Cothran* as limiting collateral review to fundamental constitutional errors. But consistent with *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), Judge Flannery actually held in *Cothran* that *any* constitutional or jurisdictional error is subject to such review on collateral attack, while statutory claims are subject to such review only if they are so fundamental as to render the court-martial proceeding unfair. *Cothran v. Dalton,* 83 F.Supp.2d at 66.

**7.** The Court in *Davis* also stated that "there can be no doubt that the grounds for relief" under both 28 U.S.C. § 2255 and 28 U.S.C. § 2254 (the general federal habeas corpus statute) are the same: "relief is available on the ground that '[a person] is in custody in violation of the Constitution *or laws* or treaties of the United States.'" *Davis v. United States,* 417 U.S. at 344, 94 S.Ct. 2298 (*quoting* 28 U.S.C. § 2254) (emphasis by Supreme Court).

*also Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). The Court of Appeals for the Armed Forces is a court made up of civilian judges appointed to fifteen year terms by the President, with the advice and consent of the Senate. 10 U.S.C. § 942; *see Weiss v. United States,* 510 U.S. at 169, 114 S.Ct. 752. When "[d]ealing with areas of law peculiar to the military branches," the judgments of the Court of Appeals for the Armed Forces therefore "are normally entitled to great deference." *Middendorf v. Henry,* 425 U.S. 25, 44, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *see Schlesinger v. Councilman,* 420 U.S. 738, 764, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) (Brennan, J., dissenting) (*quoting Noyd v. Bond,* 395 U.S. at 696, 89 S.Ct. 1876) (deference by civilian courts most appropriate when cases involve extremely technical provisions of Uniform Code of Military Justice). Deference, of course, does not mean that an Article III court cannot review the military courts' conclusions with respect to statutes and regulations or apply its own interpretation of the law. *See Middendorf v. Henry,* 425 U.S. at 43–46, 96 S.Ct. 1281. This deferential approach to "military law" includes both military regulations and the provisions of the UCMJ, but not (importantly for this case) the United Nations Participation Act and other statutes of general applicability.

█ In sum, the Court's review in this case is limited to: (1) challenges to the jurisdiction of the court-martial tribunal; (2) constitutional challenges not fully and fairly considered by the military courts; (3) constitutional challenges resolved by the military courts in contravention of Supreme Court standards, unless conditions peculiar to military life require a different rule; and (4) non-constitutional legal challenges that implicate fundamental defects in the court-martial proceedings. *See*

*Davis v. United States,* 417 U.S. at 344, 94 S.Ct. 2298; *Kauffman v. Secretary of the Air Force,* 415 F.2d at 997; *Cothran v. Dalton,* 83 F.Supp.2d at 66. The military courts' interpretation of specifically military law is furthermore afforded considerable deference.

### C. Petitioner's Claims

1. Count I: Lawfulness of the Uniform Order as a Question for the Military Judge

█ Count I of the Second Amended Complaint asserts constitutional error in the CAAF's holding that the lawfulness of the uniform order disobeyed by petitioner was not an element of the offense of disobedience under Article 92 of the UCMJ, and was a question of law properly decided by the military judge. *See* 2d. Am. Compl. ¶¶ 29–31, 39–41; Pl's. Opp. at 25. Petitioner claims that under the Supreme Court's decision in *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), the lawfulness of the order was an element of the offense of disobedience, and the military judge's failure to submit the question to the court-martial panel violated petitioner's Sixth Amendment right to a jury trial. *See* 2d. Am. Compl. ¶¶ 39–41; Pl's. Opp. at 25.

█ *Gaudin,* however, simply does not apply in this context. The accused in court-martial proceedings are entitled to some constitutional protections, but the Sixth Amendment's guarantee of a jury of one's peers does not exist when one stands before a court-martial tribunal. "[M]ilitary tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts." *U.S. ex rel. Toth v. Quarles,* 350 U.S. 11, 17–18, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *see also Whelchel v. McDonald,*

340 U.S. 122, 127, 71 S.Ct. 146, 95 L.Ed. 141 (1950) (right to trial by jury guaranteed by Sixth Amendment not applicable to trials by courts-martial or military commissions); *Ex Parte Quirin*, 317 U.S. 1, 40–41, 63 S.Ct. 1, 87 L.Ed. 3 (1942) (Sixth Amendment right to jury trial does not extend to trial by military commission); *Ex Parte Milligan*, 71 U.S. 2, 123, 4 Wall. 2, 18 L.Ed. 281 (1866) (Sixth Amendment right to jury trial limited to persons subject to indictment or presentment in civilian courts under Fifth Amendment). To the extent that a right to jury trial exists in this context, it is a creation of the Uniform Code of Military Justice, not the United States Constitution.[8]

Accordingly, the CAAF appropriately looked to the provisions of the UCMJ and to the military courts' jurisprudence to answer this question. Interpreting Article 51(b) of the UCMJ, Section 801(a)(4) of the Manual for Courts–Martial, and *United States v. Carson*, 15 USCMA at 408, it determined the lawfulness of both the uniform and the deployment orders to be questions of law properly decided by the military judge as an interlocutory matter. *New II*, 55 M.J. at 100–01. In further holding that lawfulness was not an element of the offense of disobedience, the CAAF again treated the question as "a matter of statutory interpretation" and looked to the UCMJ as well as to traditional practice in military courts. *Id.* at 104–05.

These issues were fully litigated at trial and considered carefully by the military courts of appeals. *See* Trial Record at 433–49; *New I*, 50 M.J. at 736, 738–39; *New II*, 55 M.J. at 100–06. This Court declines petitioners' invitation to review these holdings, both because the military courts fully and fairly considered petitioner's challenges, and also because they assert neither constitutional infirmities nor other "fundamental defects" amenable to collateral review, but rather specialized questions of military law on which the Court defers to the military courts.

### 2. Count II: Lawfulness of the Deployment Order

■ In Count II, petitioner renews several challenges to the lawfulness of the deployment order that were rejected by the military courts. Petitioner claims that the deployment order was illegal under the United Nations Participation Act; that it violates the Appointments and Commander–in–Chief clauses of the United States Constitution; and that it would force petitioner to serve as a "United Nations fighting person," in violation of the Thirteenth Amendment prohibition against involuntary servitude.

At trial, petitioner presented hundreds of pages of briefing and extensive testimony from a designated expert in international law to show that the deployment order violated the UNPA. The military judge considered the evidence and made several findings of fact with regard to this question. *See* Trial Record at 424–28; *New I*, 50 M.J. at 736–38. Ultimately, however, he found the legality of the deployment order to present a nonjusticiable political question, and rejected petitioner's UNPA challenge to the deployment order. *See* Trial Record at 421–31.

The military judge also rejected petitioner's constitutional challenges to the de-

---

**8.** Perhaps recognizing the inapplicability of the Sixth Amendment in this context, plaintiff attempts to frame the *Gaudin* question as one of simple due process. Without the jury trial guarantees of the Sixth Amendment, however, due process alone is insufficient to give petitioner that which he seeks. "The [Sixth] Amendment was tailored explicitly for the criminal justice system," and it "define[s] the 'process that is due' ..." *Gerstein v. Pugh*, 420 U.S. 103, 125 n. 27, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

ployment order as presenting a political question. Although these issues were briefed by the parties, it is not clear from the trial record that these challenges (unlike petitioner's UNPA argument) were fully and fairly considered by the military judge before he held them to present nonjusticiable political questions. The military appellate courts upheld the trial judge's rulings on the political question doctrine. *See New I*, 50 M.J. at 740–41; *New II*, 55 M.J. at 108–09.

To the extent that the military courts' determination that the legality of the deployment order was a nonjusticiable question prevented their reaching the merits of petitioner's challenges, they did not afford full and fair consideration to these challenges, and *Burns* therefore does not preclude collateral review. The military courts did not necessarily err in holding that petitioner's challenges to the deployment order presented a nonjusticiable political question, but under *Burns* the Court will not defer to their decisions on this issue.

The Court's analysis of petitioner's challenges to the deployment order's lawfulness, then, must start by determining (1) whether the challenge is within the proper scope of collateral review, and (2) whether the challenge presents a nonjusticiable political question. Only if the first question is answered in the affirmative and the second in the negative must the Court consider petitioner's challenges on their merits.[9]

### a. Political Question Doctrine

■ The contours of the modern political question doctrine were identified by the United States Supreme Court in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691. *See also Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); *Goldwater v. Carter*, 444 U.S. 996, 998, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). The doctrine is "essentially a function of the separation of powers," *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691, insofar as it is beyond the competence or authority of the judicial branch to review certain decisions constitutionally committed to the political branches, or, in some cases, to intervene in controversies between those branches by fixing the allocation of powers between Congress and

---

9. The trial judge also held (and respondents argue) that the legality of the deployment order is irrelevant to petitioner's court-martial conviction, because petitioner was convicted of disobeying the uniform order, not the deployment order. Trial Record at 429. Petitioner's position is that because the lawfulness of the former flows from the lawfulness of the latter, the deployment order is relevant. Because the Court finds all of petitioner's challenges to the deployment order either to present nonjusticiable political questions, to be outside the scope of collateral review, or to be without merit, it need not resolve this question.

the President under the Constitution. The doctrine also encompasses situations where a case presents factual questions, or mixed questions of law and fact, not amenable to judicial determination because of a "lack of judicially discoverable and manageable standards." *See id.; see also Campbell v. Clinton,* 203 F.3d 19, 24–28 (D.C.Cir.2000) (Silberman, J., concurring).

In arguing for affirmance of the military courts' application of the political question doctrine to preclude consideration of the legality of the deployment order, respondents assert that the courts traditionally have declined to assert jurisdiction over legal challenges to the President's deployment of the armed forces. *See* Defs.' Mot. Dismiss at 6–8. Petitioner responds that his challenges to the deployment order do not implicate "the provisions of the U.S. Constitution that allocate war power between the Congress and the President," and thus do not present a nonjusticiable political question. Pl's. Opp. at 11. The War Powers clause, however, is not the only constitutional provision that may present a nonjusticiable political question; such a question may arise in relation to other constitutional provisions if one or more of the conditions set out in *Baker* prevail.

■ Petitioner also argues that this case is distinct from many of those in which a nonjusticiable political question has been found, because it is not "a political dispute" between the branches, but a court-martial, at which petitioner has "liberty and property interests" at stake. Pl's. Opp. at 14–15. By court-martialing petitioner for disobedience, petitioner argues, the government has "put into play" the issue of the order's lawfulness, and it should not "under the guise of the political question doctrine" be permitted to remove the issue from consideration. *Id.* at 16. This argument is based on an erroneous understanding of the policy behind the political question doctrine. The doctrine does not exist to protect or advantage government litigants; it exists "to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *see also Gilligan v. Morgan,* 413 U.S. 1, 9–10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). To the extent that the Court's restraint works to the government's benefit in this case, it is because the doctrine prevents the normal presumption of a military order's lawfulness from being rebutted.

■ In any event, petitioner's claim that the government "put into play" the issue of the deployment order is misguided. It was petitioner who sought to bring into question the order's legality by his deliberate and informed decision to disobey the uniform order in violation of Article 92 of the UCMJ. Having come to the conclusion that the orders he had been given were unlawful, petitioner had numerous avenues, besides direct disobedience, by which to challenge that order.[10] Instead, petitioner chose to disobey the order, knowing full well that a court-martial prosecution was the normal and predictable consequence of that action. Petitioner may be applauded for acting "according to his convictions" in refusing to obey an

---

10. "Congress has provided him with a variety of means to communicate his views to his superiors and national policy makers. He may challenge policy through a complaint under Article 138, UCMJ, 10 U.S.C. § 938; he may raise his concerns to the Inspector General of the Department of Defense, 5 U.S.C. Appendix; and he may communicate directly with Members of Congress and Inspectors General without interference from his military superiors and with protections against reprisal, 10 U.S.C. § 1034." *New II,* 55 M.J. at 110 (Effron, J., concurring).

order he thought illegal, but having put his liberty on the line to make an arguably political statement, he can hardly argue that the posture of the case places it beyond the reach of the political question doctrine. *See New II*, 55 M.J. at 110 (Effron, J., concurring).

Nonetheless, in characterizing the legality of the deployment order as a nonjusticiable political question, the CAAF improperly aggregated all of petitioner's claims of illegality under the rubric of a "challenge to the President's use of the Armed Forces." *See New II*, 55 M.J. at 109–10. *Baker* makes clear that the proper application of the doctrine turns not on the political nature of the action or decision being challenged, but on the nature of the particular legal challenge itself. "The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691. *See also Antolok v. United States*, 873 F.2d 369, 392 (D.C.Cir.1989) (Wald, C.J., concurring) ("I read [*Baker v. Carr*] as a reminder that our focus should be on the particular issue presented for our consideration, not the ancillary effects which our decision may have on political actors."). Thus, the Court must consider individually the justiciability of each of petitioner's specific challenges to the deployment order.

b. United Nations Participation Act

Petitioner first contests the deployment order under the United Nations Participation Act, 22 U.S.C. § 287, *et seq.* The military courts considered and rejected this challenge as presenting a nonjusticiable political question.

■ Petitioner's challenge under the UNPA does not raise a claim of fundamental error or unfairness in his court-martial proceedings, and this Court therefore will not re-assess it on collateral review. The UNPA, the "law of the United States" petitioner claims his conviction was ren-

dered in violation of, is a statute governing the powers and conduct of the President in his conduct of foreign affairs; it does not vest any personal rights in petitioner, nor does it implicate in any fashion the conduct of court-martial or other military disciplinary proceedings. Thus, it is unlikely that even an incorrect application of this law would cause a "fundamental defect" in petitioner's court-martial proceedings. *See Davis v. United States*, 417 U.S. at 346, 94 S.Ct. 2298. Furthermore, the military court heard extensive testimony and argument from petitioner on the application of the UNPA to the facts at hand, and by all indications considered the issue fully and fairly. Petitioner may disagree with the outcome, but there is nothing fundamentally unfair about the military courts' decisions that the political question doctrine bars consideration of petitioner's claim under the UNPA.

■ In any event, the Court agrees that this challenge presents a nonjusticiable political question. The essence of petitioner's claim is that President Clinton unlawfully circumvented the UNPA's requirement of congressional consent for certain types of troop deployments by misrepresenting the nature of the action in Macedonia. The President purported to conduct the operation under 22 U.S.C. § 287d–1 ("Noncombatant assistance to United Nations"), which authorized him, without the consent of Congress, to deploy up to one thousand armed forces personnel "to serve as observers, guards, or in any noncombatant capacity" with the United Nations, under Chapter VI of the U.N. charter. *Id.* Petitioner argues, however, that the deployment order did not meet the requirements of that provision, but should in fact have been conducted under 22 U.S.C. § 287d ("Use of armed forces; limitations"), which refers to Chapter VII of the U.N. charter and au-

thorizes the President to detail troops to the U.N. for combat purposes only with the approval of Congress.

Petitioner raises a question of the allocation of war-making power between the political branches: must the President have obtained the consent of Congress before initiating this operation in Macedonia? There is, however, no conflict between the branches on this matter; no contingent of Congress has ever stepped forward to dispute the President's characterization of the Macedonian deployment as a Chapter VI operation or suggested that he had to seek the approval of Congress before proceeding.[11] "Judges traditionally have expressed great reluctance to intercede in disputes between the political branches of government that involve matters of war and peace." *Campbell v. Clinton,* 52 F.Supp.2d 34, 40 (D.D.C.1999). When no evidence of such a dispute even exists and, by all appearances, the executive and legislative branches agreed in this instance that there was no need for congressional approval, it would be most inappropriate for the Court to "undertak[e] independent resolution [of the issue] without expressing

lack of the respect due coordinate branches of government." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. 691; *see also Ange v. Bush,* 752 F.Supp. at 514 ("This court's refusal to exercise jurisdiction ... by no means permits the President to interpret the executive's powers as he sees fit ... Congress possesses ample powers under the Constitution to prevent Presidential overreaching, should Congress choose to exercise them."). The Court therefore finds this challenge to the deployment order to present a nonjusticiable political question.

c. Appointments Clause

■ Petitioner also asserts that the deployment order violates the Appointments Clause, U.S. Const., Art. II § 2, cl. 2.[12] The basis of this claim is that "by the order to deploy to Macedonia as a member of a U.N. military force, New was placed under the command and control of a foreign military officer who had not been appointed in accordance with the procedural provisions set forth in Section 2, Article II[.]" Pl's. Mot. Reopen at 32.[13]

---

11. On July 9, 1993, and again on January 8, 1994, President Clinton reported to the House of Representatives on the status of U.S. operations in Macedonia. In these reports, the President characterized the operations as proceeding under Chapter VI of the U.N. Charter, and the U.S. presence in Macedonia as a "peacekeeping force" deployed in compliance with the UNPA. Petitioner makes no assertion, and there is no indication, that Congress ever questioned the President's description.

12. The clause reads, in its entirety:
[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provid-

ed for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

13. To demonstrate that this challenge is justiciable, petitioner cites cases in which the Supreme Court has entertained Appointments Clause challenges to the appointment of a variety of government officials. *See* Pl's. Mot. Reopen at 32. The cases cited, however, indicate only that *some* Appointments Clause challenges do not raise nonjusticiable political questions, not that this one is justiciable. Petitioner offers no precedent for an Appointments Clause challenge to the designation of an individual involved in the day-to-day conduct of foreign affairs or military field operations.

Officers of the United States for purposes of the Appointments Clause are persons either appointed by the President and confirmed by the Senate, designated as "superior officers," or those "inferior officers" whose appointments Congress vests in the President alone, or the Courts, or the heads of Departments. U.S. Const., Art. II § 2, cl. 2; *see Buckley v. Valeo*, 424 U.S. 1, 124–25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *United States v. Germaine*, 99 U.S. 508, 511–12, 9 Otto 508, 25 L.Ed. 482 (1878). The Appointments Clause imposes different procedural requirements on the designation of these two types of officers. *See United States v. Germaine*, 99 U.S. at 509–10, 9 Otto 508. Military officers in the field, even command officers, are not "superior officers" who must be confirmed by the Senate, but "inferior officers" commissioned by the President. *See Weiss v. United States*, 510 U.S. at 182, 114 S.Ct. 752 (Souter, J., concurring).

For any foreign military officer involved in the Macedonian deployment to have been subject to any of the procedural requirements of the Appointments Clause, such an individual must in fact have been an "officer of the United States," which the Supreme Court has defined as an "appointee exercising significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. at 125, 96 S.Ct. 612. Although the phrase "significant authority" is not clearly defined, the term "officer of the United States" has been held to "embrace[ ] the idea of tenure, duration, emolument, and duties [that are] continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. at 509–10, 511–12, 9 Otto 508.

To the extent that United Nations officers on the mission to Macedonia exercise any power "under the laws of the United States," a dubious proposition, they do so only under a temporary arrangement limited in both scope and duration. Their power to direct U.S. forces is entirely subject to the "terms and conditions" defined by the President under the UNPA, pursuant to his determination of what is "consistent with the national interest." 22 U.S.C. § 287d–1. The U.N. officers' extremely limited scope of authority is indicated by the military judge's factual determination that "[t]he United States military chain-of-command remained inviolate" in Macedonia under the deployment order. *New II*, 50 M.J. at 738; *see* Trial Record at 426–27. Because their authority has been carefully circumscribed, these individuals do not exercise "significant authority pursuant to the laws of the United States," and thus are not "officers of the United States" for Appointments Clause purposes. *Buckley v. Valeo*, 424 U.S. at 125, 96 S.Ct. 612. *Cf. United States v. Hartwell*, 6 Wall. 385, 73 U.S. 385, 393, 18 L.Ed. 830 (1867) ("A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other.").

Because the Court finds that the United Nations officers in question did not exercise "significant authority" under the laws of the United States, the Court holds that they are not officers of the United States and that the deployment order therefore does not offend the Appointments Clause.

d. Commander–in–Chief Clause

■ Petitioner claims that the deployment order violated the Commander–in–Chief Clause, U.S. Const., Art. II § 2, cl. 1, because "by deploying American soldiers under the command and control of foreign military officers" the President wrongfully delegated his authority as Commander–in–

Chief to officers of foreign militaries. Pl's. Mot. Reopen at 32.

The Commander–in–Chief clause commits to the President the discretion to command the Armed Forces of the United States "in the manner he may deem most effectual to harass and conquer and subdue the enemy." *Fleming v. Page,* 50 U.S. 603, 615, 9 How. 603, 13 L.Ed. 276 (1850). While the Supreme Court has never said that all decisions made by the President purportedly in his role as commander-in-chief are beyond the purview of the judicial branch, *see, e.g., Mitchell v. Laird,* 488 F.2d 611, 614 (D.C.Cir.1973); *Flynt v. Rumsfeld,* 245 F.Supp.2d 94, 110 (D.D.C. 2003), *aff'd on other grounds* 355 F.3d 697 (D.C.Cir.2004), the clause itself represents "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *see Nixon v. United States,* 506 U.S. at 228–29, 113 S.Ct. 732; *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. 691, thus placing a challenge like petitioner's squarely within the realm of cases that present nonjusticiable political questions.

Petitioner argues, however, that his claim does not present a political question, because the basis for the challenge is not that the President has unwisely exercised his *discretion* under the Commander–in–Chief clause, but that he has, by his delegation of authority to United Nations officers, completely abrogated his *duty* to command the armed forces. *See* Pl's. Mot. Reopen at 32–33. Even if the political question doctrine recognized some distinction between "duties" and "discretion" with respect to the commitment of an issue to one of the political branches, the Court is without "judicially discoverable and manageable standards" for deciding whether the President has abrogated entirely his constitutional duty to command. Such a decision would involve policy determinations beyond the competence of the Court. As the Supreme Court stated:

> It would be difficult to think of a clearer example [than the deployment of military forces] of the type of governmental action that was intended by the Constitution to be left to the political branches ... Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system[.]

*Gilligan v. Morgan,* 413 U.S. at 10–11, 93 S.Ct. 2440 (emphasis omitted). Petitioner's challenge is thus nonjusticable.

Even if the question were justiciable, the only authority cited by petitioner in support of his claim that the President's authority as commander-in-chief may not be delegated is *Printz v. United States,* 521 U.S. 898, 936, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), in which the Supreme Court, invalidating provisions of the Brady Handgun Violence Prevention Act for unconstitutionally commandeering state officials to perform duties under federal law, discussed the need to preserve presidential control over the implementation of congressional directives. *Printz,* however, dealt not with the President's power to make war or conduct foreign affairs, but with a *congressional* delegation of responsibility, and focused on the obligations un-

constitutionally imposed by the Brady Handgun Law on *state* officials. It is thus completely inapposite to the present case.

Furthermore, the military judge at petitioner's court-martial made a factual finding that "[t]he President, as commander-in-chief, specifically retains command authority over all United States armed forces deployed in Macedonia. . . . [T]he chain of command, from President to the United States armed forces commander in the field, remains inviolate." Trial Record at 426–27. Thus, even if petitioner could adduce authority to support his theory of unconstitutional delegation, it would be unsupported by the facts in this case. Petitioner's Commander–in–Chief clause objection to the deployment order therefore fails.

### e. Thirteenth Amendment

■ Petitioner's final challenge to the deployment order is that the order forced him into service as a "United Nations fighting person," rather than the "United States soldier" he had agreed to serve as, in violation of the Thirteenth Amendment prohibition on involuntary servitude. Petitioner argues that this challenge does not present a political question under *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911); *Butler v. Perry,* 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916); and *Selective Draft Law Cases,* 245 U.S. 366, 390, 38 S.Ct. 159, 62 L.Ed. 349 (1918). *See* Pl's. Mot. Reopen at 31–32. The Court agrees with petitioner in this respect. Because this challenge implicates not the authority of the President to order the deployment of U.S. forces under the Constitution but petitioner's personal right not to be forced into involuntary servitude, it does not present a nonjusticiable political question. Neither, however, does it constitute a meritorious claim under the Thirteenth Amendment.

■ Petitioner cites cases demonstrating that the courts do, from time to time, consider Thirteenth Amendment defenses to the enforcement of criminal laws; he does not, however, adduce any authority for the proposition that service in the United States military, but under the auspices of an international organization, might constitute involuntary servitude. Indeed, the very cases cited by petitioner indicate that even compulsory military service is generally outside the scope of the Thirteenth Amendment:

> [The Thirteenth] amendment was adopted with reference to conditions existing since the foundation of our Government, and the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect of services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the State, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers.

*Butler v. Perry,* 240 U.S. at 332–33, 36 S.Ct. 258. *See also Selective Draft Law Cases,* 245 U.S. at 374, 38 S.Ct. 159 ("The Thirteenth Amendment was intended to abolish only the well-known forms of slavery and involuntary servitude akin thereto, and not to destroy the power of the Government to compel a citizen to render public service.").

If the Thirteenth Amendment presents no obstacle to compelled military service in the interest of the government, it can hardly be said to bar service that is voluntarily assumed, but discharged under com-

mand arrangements the soldier finds disagreeable. Even assuming for the sake of argument that the deployment would have rendered petitioner a "United Nations fighting person," for Thirteenth Amendment purposes there is no difference between service under the flag of the United States and service under the flag of an international organization, but ordered by and ultimately in the service of the United States. The Court accordingly finds petitioner's challenge to the deployment order under the Thirteenth Amendment to be without merit.

### 3. Counts III & IV: Lawfulness of Uniform Order

■ Counts III and IV of the Second Amended Complaint challenge the military judge's finding that the uniform order did not violate the Foreign Emoluments Clause of the United States Constitution, U.S. Const., Art. I § 9, cl. 8. *See* 2d. Am. Compl. ¶¶ 45–56.[14] Count III asserts that, by submitting a "stipulation of fact" to the military judge establishing that the uniform modifications had not been approved by the Army's Director of Heraldry, the Department of Defense, or the Department of the Army, petitioner established a *prima facie* case of a violation of the Foreign Emoluments Clause. Petitioner argues that by denying his motion to dismiss, the military judge did not afford petitioner "a full and fair opportunity" to litigate his claim on the merits. *See* 2d. Am. Compl. ¶ 49; Opp. at 31. Alternatively, Count IV claims that the military judge's finding that the U.N. patch and cap did not violate Army uniform regula-

tions "lack[s] 'fair support' in the record, or in the alternative, constitut[es] an unreasonable determination of the facts in light of the evidence presented in the court-martial proceedings." 2d. Am. Compl. ¶ 53. This erroneous factual determination (and its affirmance by the ACCA and the CAAF), petitioner claims, constituted an "unfair" adjudication of his Foreign Emoluments Clause challenge to the uniform order.

■ Petitioner in essence asks this Court to re-weigh the evidence presented to the trial judge. That petitioner characterizes the military judge's evidentiary finding as "unfair" does not allow him to circumvent the basic principle that courts considering habeas corpus challenges to court-martial convictions are not free to revisit the military courts' evidentiary rulings or findings of fact. *See Burns v. Wilson*, 346 U.S. at 142, 144, 73 S.Ct. 1045. The military judge found petitioner's factual proffer insufficient to rebut the presumption of lawfulness that attaches to military orders; it is not for this Court to disturb that finding. Even if petitioner advanced some legal argument as to why the uniform order violated the Army regulations, this is not a claim of fundamental error amenable to review by habeas corpus.

■ Petitioner's only constitutional claim—supported neither by precedent nor by argument—is that the uniform order would have forced him to accept emoluments from a foreign government, in violation of the Foreign Emoluments Clause.[15]

---

14. The clause reads, in its entirety: "No title of nobility shall be granted by the United States: and no person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, emolument, Office, or Title of any kind whatever from any King, Prince, or foreign State."

15. In his petition to reopen proceedings, petitioner asserts that the Emoluments Clause challenge to the uniform order raised in his motion to dismiss the charges actually relied not on the "emoluments" part of the clause, but on the argument that the order unconstitutionally forced petitioner to assume a "foreign office." Pl's. Mot. Reopen at 34.

This argument was extensively litigated at trial, *see New I*, 50 M.J. at 736, and raised and rejected on appeal; it was thus fully litigated in the military courts. Petitioner has offered (and there appears to be) no Supreme Court precedent defining the scope and application of the clause; thus it cannot be said that the military courts' decision that there was no constitutional violation was inconsistent with "Supreme Court standards." [16]  The Court therefore will not second-guess the military courts' rejection of petitioner's Foreign Emoluments Clause challenge.

## III.   CONCLUSION

Each of petitioner's challenges to his court-martial conviction either is outside the scope of collateral review, presents a nonjusticiable political question, or is without merit as a matter of law. Petitioner's complaint therefore fails to state a claim upon which relief may be granted. Therefore, respondents' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure must be granted.

Petitioner abandoned that argument in his Second Amended Complaint, and on review of the petitioner's motions to the court-martial, the Court can locate no record of such an argument having been made. In any event, the Court believes this argument to be factually and legally groundless.

16.   In any event, in the judgment of this Court the uniform order does not violate the plain language of the Emoluments Clause. Assuming *arguendo* that the United Nations is a "foreign state" and that the uniform accouter-

ments were actually issued by the United Nations, neither the patches nor the cap qualifies as an "emolument," which is defined as "The profit arising from office, employment, or labor ... any perquisite, advantage, profit, or gain arising from the possession of an office." BLACK'S LAW DICTIONARY 524 (6th ed.1991). Although the uniform accouterments provided some safety benefits, they conferred no "profit" or "gain" on the soldiers to whom they were issued.